**Judith R. BURKE and James W. Burke and Brett M. Grossetta, an infant, by his mother and next friend, Judith R. Burke**

v.

**UNITED STATES of America.**

**Civ. A. No. M–84–425.**

United States District Court,
Maryland.

March 21, 1985.

---

William O. Snead, III and Cremins, Snead & Annunziata, and L. Palmer Foret and Carr, Goodson & Lee, P.C., Rockville, Md., for plaintiffs.

J. Frederick Motz, U.S. Atty., D. Maryland, and Jack C. Tranter, Asst. U.S. Atty., Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

JAMES R. MILLER, Jr., District Judge.

This case, brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et seq.*, presents difficult issues relating to damages. Liability has been all but admitted. This Memorandum shall constitute the court's partial findings of fact and conclusions of law, pursuant to Fed.R. Civ.P. 52, based on the evidence presented at the nonjury trial, which began in October, 1984, and in the oral and written arguments of counsel.

### I. *Background*

The plaintiffs are Judith R. Burke and her husband, James W. Burke, who were married in December of 1980 when Mrs. Burke was 32 years old and Mr. Burke was 35 years old. Mrs. Burke previously had been married twice. She has a son by her first marriage, Brett M. Grossetta, who was 13 years of age at the time of the trial and who resides with Mr. and Mrs. Burke.[1]

At the time of their marriage and until March, 1983, when he retired, Mr. Burke was on active duty in the United States Navy as a Master Chief Petty Officer.

Prior to April, 1981, Mrs. Burke enjoyed good health, although she had been diagnosed as having fibrocystic disease in both breasts in June, 1980, and had been instructed on monthly breast exams. Her breasts had been examined at the Primary Care Clinic in Quantico, Virginia on September 19, 1980 and were negative for masses.

### II. *Negligence*

On April 8, 1981, the Burkes discovered a lump on Judith Burke's left breast. The next day she was examined at the Quantico Primary Care Center, a federal government facility, where she was noted to have a "large cyst" in the left upper outer quadrant. She was referred to the National Naval Medical Center, Bethesda, Maryland (hereinafter "Bethesda"), for a consultation with the surgery department.

On April 14, 1981, Mrs. Burke was seen at the surgery clinic at Bethesda by Dr. Bruce Davis. His examination revealed a firm, mobile mass, two and a half by two and a half centimeters in size, located in the upper outer quadrant of Mrs. Burke's left breast. There were no signs of skin retraction, skin edema, ulceration, inflammation or other evidence of breast disease. The patient was negative for lymph node involvement. Dr. Davis thought the mass was probably fibrocystic disease or fibrous mastopothy, but he could not rule out cancer. Accordingly, the patient was scheduled for a biopsy with Mrs. Burke's consent.

The biopsy was performed by Dr. Davis at Bethesda on April 20, 1981. Although Dr. Davis has no specific recollection of the

---

1. The claim of Brett Grossetta for loss of support and solatium was dismissed without prejudice on November 30, 1984.

April 20, 1981 biopsy, Mrs. Burke testified that he told her that he did not remove the entire mass but did remove a sufficient amount for examination in the hospital's anatomical pathology division. There were no signs of any attachment of the mass to the skin or to the chest wall.

Following the biopsy, which had been done with a local anesthetic, Mr. and Mrs. Burke were advised by Dr. Davis that the preliminary pathology report indicated that the mass was benign. Several days later, Mrs. Burke returned to Bethesda for removal of the sutures. She again was accompanied by her husband as she had been at the time of the biopsy. Dr. Davis advised the Burkes that the final pathology report indicated that the mass was benign. He advised Mrs. Burke to continue with monthly breast self-examinations and to return for a follow-up visit sometime in the next three to six months.

On or about November 2, 1981, Mrs. Burke returned to the surgery clinic at Bethesda for a follow-up breast exam. An unknown physician examined her, and there is no medical record evidencing the examination. Mrs. Burke told the examining physician that she thought the portion of the mass which remained in her left breast was increasing in size. After the physician had completed examining her, according to the testimony of Mrs. Burke, the physician told her that women with fibrocystic disease (a benign condition in which lumps develop in the breasts) were paranoid, that every lump which appears in a woman's breast who has fibrocystic disease cannot be biopsied, and that he disagreed with Dr. Davis' advice that she should have periodic breast examinations at the intervals suggested by Dr. Davis. Mrs. Burke felt belittled after this episode, but reassured.

Mrs. Burke next sought medical care at Bethesda on September 23, 1982, following a visit to the emergency room the previous day at Quantico Naval Dispensary with a complaint of pain and numbness in the left hand and arm of approximately four weeks' duration and which had been diagnosed as carpel tunnel syndrome. Unsatisfied with that diagnosis, she went to the acute care clinic at Bethesda where she again complained of left arm discomfort and chest pains. She was administered an EKG and referred to the "breast surgery" for a complaint of acute exacerbation of pain in the left breast with an increasing mass in the upper outer quadrant. She gave a history to the physician's assistant on that date of having been told that she was cancer-phobic on the follow-up visit at the surgery clinic at Bethesda in November. She told the physician's assistant who examined her that she had begun noticing an increase in the size of the mass in her left breast approximately two or three months previously. The physician's assistant felt what he estimated to be a four centimeter by five centimeter mass in the upper outer quadrant of Mrs. Burke's left breast, and he recommended that she return to the surgery clinic for further examination.

On September 30, 1982, Mrs. Burke returned to Bethesda where she was seen by Dr. R.C. Martin and later by Dr. Davis, the physician who had performed the April, 1981 biopsy. The physicians palpated a mass, described as being firm and non-fixed, which was located under a four centimeter biopsy incision. The thickening and scarring in the area of the previous surgical incision made the evaluation of the breast difficult. Diagnostically, the mass was thought to be a recurrent, benign tumor of the left breast, possibly residual scarring secondary to biopsy, and acute exacerbation of fibrocystic disease. Mrs. Burke was upset with the prospect of another biopsy. Dr. Davis decided to have a mammogram taken of Mrs. Burke's left breast. A mammogram is a type of x-ray examination which may show conditions suggestive of carcinoma. A mammogram was taken on October 5, 1982 and revealed calcifications in the upper outer quadrant of the left breast suggestive of carcinoma.

A biopsy was performed at the site of the original biopsy on October 8, 1982 and revealed infiltrating ductal carcinoma (can-

cer). Shortly after the biopsy was completed, Dr. Davis told Mr. and Mrs. Burke in his office that the pathology report revealed that she had cancer and that she needed a modified radical mastectomy of her left breast. A modified radical mastectomy is a procedure in which all of the breast tissue and axillary contents are removed but in which the pectoralis major and other muscles are not removed. Mr. and Mrs. Burke were, understandably, emotionally devastated by what Dr. Davis told them.

On October 19, 1982, Dr. Davis performed the scheduled modified radical mastectomy. Eight of 14 lymph nodes examined contained metastic tumor, and the tumor had grown out of the lymph nodes into the axillary fat. The pathological report identified a 3.3 by 3.5 by 1.4 centimeter fully circumscribed, firm, infiltrating tumor mass beneath the original biopsy site. The breast was pathologically diagnosed as showing extensive invasive intraductal carcinoma involving superior and inferior lateral quadrants and within the deep surgical margin. Mrs. Burke was found to have positive estrogen and progesteron receptors, which generally is a favorable sign for less early recurrence.

In November, 1982, following Mrs. Burke's mastectomy, the microscopic sections of her April, 1981 biopsy were reviewed. At the time of this review, it was determined that the original benign diagnosis was incorrect, and the microscopic diagnosis was changed to "left breast biopsy: focal intraductal and infiltrating ductal carcinoma." This revised diagnosis was set forth in an addendum pathology report dated November 29, 1982. The following "comment" was included in the addendum report:

"Review of the original slides from this case disclosed a microscopic focus of ductal epithelia atypia suggestive for carcinoma. Step sections were reviewed which contained a small area of intraductal and infiltrating ductal carcinoma. Because this focus was not identified and investigated originally estrogen recep-

tors were not obtained on this biopsy specimen."

On November 2, 1982, Judith Burke's case was presented to the Tumor Board at Bethesda. It was determined that a more aggressive chemotherapy than classic cytoxin, methotrexate and five-flourouracil (C.M.F.) was indicated. It was necessary to treat this patient as Stage III metastases, even in the absence of clinical evidence of metastases, by virtue of the extensive nodal involvement, invasion of the axillary fat beyond the lymph nodes, invasion of the tumor in the margins of the surgery, the size of the tumor, and the delay of 18 months in treating the cancer. The drug of choice was cytoxin, adriamycin, and five-flourouracil (C.M.F.), a highly toxic drug which increases patient morbidity. This course of chemotherapy was decided upon after examination of Mrs. Burke by Dr. Marsha Brown in the Hematology/Oncology Clinic at Bethesda and review of the case by Dr. Mark Lippman, a cancer specialist at the National Cancer Institute of the National Institutes of Health.

On November 12, 1982, Mrs. Burke and her husband were told by Dr. Marsha Brown that the initial biopsy was not negative as originally reported, but that a recent examination of the tissue removed in April of 1981 revealed that Mrs. Burke had breast cancer at the time of the earlier biopsy. At this visit, Mrs. Burke began the first cycle of her chemotherapy.

Mrs. Burke was treated aggressively with 12 cycles of chemotherapy. She was given as much of the drug as she could take and was described as very compliant. The effect, early on in the treatment, was nausea, vomiting, increased depression, fever and chills. Each of the 12 chemotherapy cycles lasted four weeks.

On January 11, 1983, Judith Burke agreed to undergo radiation therapy, in addition to the chemotherapy. She had been informed, prior to her consent, of possible and probable side effects, including long-term consequences and risks. Radiation therapy is potentially cardio-toxic and can adversely affect the host immune

system in a fight against recurrent disease. The purpose of the radiation therapy was to attempt to eliminate microscopic tumor in her surgical margin. She received radiation therapy treatments, beginning on or about January 11, 1983 and ending on March 9, 1983.

In the meantime, she was continuing her chemotherapy. Each chemotherapy cycle involved the administration of drugs on the first and eighth day of the cycle. During the course of chemotherapy, Mrs. Burke continued to suffer significant nausea and vomiting. She also lost her hair. Various drugs were tried to give her antiemitic control without result. By cycle eight, day one, nausea and vomiting were so severe that Judith Burke refused to continue therapy. It was explained to her again, as it had been previously, that she should receive 12 months of therapy because of her young age, aggressive disease, positive nodal involvement, large primary tumor, and the contamination of surgical margin. Meetings were scheduled with Dr. Reichardt, a psychiatrist. The following day she agreed to continue the chemotherapy. She was followed by Dr. Reichardt and instructed on self-hypnosis. She began her 12th four-week cycle on December 21, 1983.

Throughout the course of, and at the end of, her therapy, Mrs. Burke was found to have no clinical evidence of cancer. She presently requires close follow-up every two months and complete scans every six months.

In January of 1984, Dr. L.S. Smith, a medical oncologist, saw Mrs. Burke. Various scans were performed at Dr. Smith's request. Additionally, a mammogram was performed on October 10, 1984 at Bethesda. All tests indicate no clinical evidence of metatastic disease or cancer.

Nevertheless, the prognosis for Mrs. Burke is very poor. The medical experts called both by the plaintiffs and by the defendant agreed that it is more likely than not, to a reasonable medical probability, that Mrs. Burke, although clinically asymptomatic at the time of the trial, will under-go recurrence of cancer. Due to the extensive nodal involvement, contamination of the surgical margin, the size and grade of the tumor, invasion of the axillary fat, and other factors, even considering her positive estrogen and progesteron receptors, the chances are 80 to 85% that she will have recurrence of the cancer at some location in her body within five years of October 19, 1982. Her chances of survival for a 10-year period from October 19, 1982 are 10% or less.

On the other hand, if her cancerous condition had been properly diagnosed through the pathological examination in April, 1981, the evidence is conclusive that she would have had, with the proper treatment, a 90% or more chance of survival to a normal life span without recurrence of the cancer.

■ The evidence compels the conclusion that the agents of the defendant were negligent in conducting the pathological examination in April, 1981. In fact, such negligence is admitted by the defendant. Based on the evidence, the court further concludes that the shortened life span of Mrs. Burke and the substantial worsening of her cancerous condition between April, 1981 and October, 1982 were proximately and directly caused by the negligence of the agents of the defendant, see, e.g., *Thomas v. Corso*, 265 Md. 84, 103–04, 288 A.2d 379 (1972); see also *Hicks v. United States*, 368 F.2d 626, 629–30 (4th Cir.1966); *Daniels v. Hadley Memorial Hospital*, 566 F.2d 749, 757–58 (D.C.Cir.1977), and that no negligence of Mrs. Burke contributed thereto.

### III. *Damages*

#### A. *The Law*

■ In this tragic case, the most difficult questions to be resolved by the court relate to the determination of the amount of damages which should properly be awarded to the plaintiffs. Since the negligent acts which give rise to the liability herein occurred in Maryland, the law of Maryland governs the elements and measure of damages to be awarded. *United*

*States v. Muniz,* 374 U.S. 150, 153, 83 S.Ct. 1850, 1852, 10 L.Ed.2d 805 (1963); 28 U.S.C. § 1346(b) and § 2674.

### 1. *Generally*

■ In determining damages generally, the courts of Maryland have indicated that the following factors should be considered in awarding damages in a personal injury case: (a) the personal injuries sustained and their extent and duration; (b) the effect such injuries have on the overall physical and mental health and wellbeing of plaintiff in the enjoyment of life during her life; (c) the physical pain and mental·injuries suffered in the past and which with reasonable probability may be expected to be experienced in the future; (d) the disfigurement, and the humiliation and embarrassment associated with such disfigurement; (e) the medical and other expenses reasonably incurred in the past and which with reasonable probability may be expected in the future; and (f) the loss of earnings in the past and the loss of such earnings or reduction in earning capacity which with reasonable probability may be expected in the future. *McAlister v. Carl,* 233 Md. 446, 451–56, 197 A.2d 140 (1964); *Rhone v. Fisher,* 224 Md. 223, 225–26, 167 A.2d 773 (1961); *Ihrie v. Anthony,* 205 Md. 296, 305–06, 107 A.2d 104 (1954).

### 2. *Shortened Life Expectancy*

■ It is clear in Maryland that no separate damages may be allowed for the shortening of life expectancy itself. *Rhone v. Fisher,* 224 Md. at 230, 167 A.2d 773. Nevertheless, shortened life expectancy may be considered in determining the seriousness of the injury sustained by Mrs. Burke and the physical and mental pain which the plaintiff has suffered and will suffer in the future. *Id.* at 231–32, 167 A.2d 773.

### 3. *Loss of Earning Capacity Award in a Shortened Life Expectancy Case*

■ The defendant argues that the award of any lost earnings for the plaintiff in the future will be speculative and that any such award could more properly be made later in a wrongful death action or a survival action in the event that the plaintiff does die prematurely from a recurrence of the cancer as all the experts agree is likely to be the case. This court does not agree with the defendant's assessment for a number of reasons. In the first place, if the plaintiff were to die more than three years after she had discovered her injury, it is certainly arguable that a wrongful death action would be time-barred. Since any future wrongful death action would be brought under the Federal Tort Claims Act, 28 U.S.C. § 2674, it would be governed by the substantive law of Maryland containing a three year statute of limitations applicable to personal injury actions. The Maryland law appears to be that if a decedent could not have brought a cause of action for injury at the time of the death, the wrongful death action similarly is precluded, *Melitch v. United Railways & Electric Co.,* 121 Md. 457, 462, 88 A. 229 (1913); *Cox v. Maryland Electric Railways Co.,* 126 Md. 300, 306, 95 A. 43 (1915); *State v. Consolidated Gas, Electric Light & Power Co.,* 146 Md. 390, 395–96, 126 A. 105 (1924). *See also Mills v. International Harvester Co.,* 554 F.Supp. 611, 613 (D.Md.1982).

■ Similarly, it is unlikely that a survival action could later be filed in the event that the plaintiff's cancer later recurs, resulting in her death. A survival action may be filed by the personal representative of a decedent on any cause of action, except for slander, on which the decedent might have commenced suit. *Md. Estates & Trusts Code Ann.* § 7–401(x). The representatives' right under the statute "is contingent upon the death of the injured person without having his claim for damages satisfied." *Stewart v. United Electric Light & Power Co.,* 104 Md. 332, 342, 65 A. 49 (1906). Mrs. Burke is required to bring one action for her entire claim arising from the negligent act of the defendant. She cannot bring several actions at subsequent times to recover subsequent losses. Such claims would be subject to the bar of *res judicata. See, e.g., Vane v. Hoffberger*

*Co.,* 196 Md. 450, 456–57, 77 A.2d 152 (1950); *Gelblum v. Bloom,* 21 Md.App. 406, 408, 319 A.2d 546 (1974); *Huff v. Harbaugh,* 49 Md.App. 661, 670, 435 A.2d 108 (1981).

■ In this present action, Mrs. Burke should be compensated for all her losses, including losses in the future resulting from the defendant's action.

"The authorities are uniform and clear in maintaining the principle, that the natural results of a wrongful act are understood to include all the damage to the plaintiff of which such act was the efficient cause, though in point of time the damage did not occur until some time after the act done. To such an extent is this principle carried, for the purpose of accomplishing justice, and securing to parties full compensation for wrongs suffered, that the proof of actual damages may extend to all facts which occur and grow out of the original injury, even down to the day of the verdict; the exception to this rule excluding only such facts as not only happened since the institution of the suit, but which furnish of themselves sufficient ground for a distinct suit."

*Corner v. Mackintosh,* 48 Md. 374, 389 (1877). Prospective damages may be awarded upon appropriate proof that future consequences of a past wrongful act are likely to occur to a reasonable probability. *Davidson v. Miller,* 276 Md. 54, 61–62, 344 A.2d 422 (1975).

In short, the plaintiff has a right to recover in this case for her loss of earning capacity, if any, which has been caused by the wrongful acts of the defendant for the period of time from the injury to the expiration of her work life expectancy as it would have existed immediately prior to the time of the injury.

### 4. *Normal Work Life Expectancy As Element of Loss of Earning Capacity Award*

The defendant has argued that Mrs. Burke should not be able to obtain damages for impairment of her earning capacity for the period up to her work life expectancy as it existed prior to April, 1981. Instead, the defendant argues that damages for any loss of earning capacity which Mrs. Burke has sustained would be limited to the period of her work life expectancy as it now exists.

The proper measure of damages in a case in which an individual's life expectancy has been shortened due to the negligence of the defendant has been the subject of debate. *See* Comment, *The Measure of Damages for a Shortened Life,* 22 U.Chi.L.Rev. 505 (1955); Comment, *Compensation for Shortened Life Expectancy,* 29 Md.L.Rev. 24, 34–35 (1969). British courts have generally awarded recovery for shortened life expectancy as a separate element of damages, but have calculated damages for lost wages based on the shortened life expectancy remaining to the plaintiff following the injury. "On the other hand, the American courts, while denying recovery for curtailment of life expectancy as such, have computed damages for economic loss based on the plaintiff's lifespan unaffected by the accident." 22 U.Chi.L.Rev. at 510. *See also* McCormick on Damages (1935 Ed.), pp. 303–05; *Downie v. United States Lines Co.,* 359 F.2d 344, 347 (3d Cir.), *cert. denied,* 385 U.S. 897, 87 S.Ct. 201, 17 L.Ed.2d 130 (1966).

Contrary to the assertion of the defendant in this case, the court believes that the prevailing American rule quoted above is applicable in this case and is the rule which would be followed in Maryland. While the Court of Appeals of Maryland in *Rhone v. Fisher* did not expressly approve "lost earnings for lost years," it did appear to quote with approval the general rule in the United States when deciding that no recovery could be allowed for shortened life expectancy *per se, Rhone v. Fisher,* 224 Md. at 230–32, 167 A.2d 773.

### 5. *Deduction of Personal Consumption Expenditures*

■ The defendant also contends that, in calculating any impairment of earning capacity, there should be deducted from lost

future earnings the future personal living expenses of the plaintiff. This position of the defendant rests upon the conclusion that, under the circumstances of this case, damages for future loss of earning capacity should be measured by a wrongful death analysis of damages. Since in a wrongful death case the element of damages relating to that which a decedent would have earned had he lived is based upon the "pecuniary benefit" rule, *Hutzell v. Boyer*, 252 Md. 227, 237, 249 A.2d 449 (1969), the general rule in such a case is that the pecuniary loss to the decedent's family is measured by the earnings which the decedent would have had if he had lived, less the amount which the decedent would have consumed had he lived, in order to fairly measure that which the surviving family has pecuniarily lost due to the death. *Jennings v. United States*, 178 F.Supp. 516, 530–32 (D.Md.1959); *rev'd on on other grounds*, 291 F.2d 880 (4th Cir.1961), *decision on remand aff'd*, 318 F.2d 718 (4th Cir.1963).

The only case which appears to have reduced an award to a plaintiff who was still living by an amount called the plaintiff's "living expenses" is *Flannery v. United States*, 718 F.2d 108 (4th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984). In *Flannery*, which was a Federal Tort Claims Act case, the decision was governed by the provisions of 28 U.S.C. § 2674 prohibiting "punitive damages." The court there held that, the plaintiff being comatose and unable to spend any of the money awarded to him, the plaintiff's condition differentiated the case from the usual one in which a living plaintiff is awarded damages for lost future earnings. In the usual case, the court held,

> "a living plaintiff must pay his own living expenses, though an award for lost earnings may be the source of his funds. In this case, however, the plaintiff will be required to pay nothing, for the award of future medical expenses includes all of the personal expense that the plaintiff will incur. Indeed, the testimony was that, in the future, he will need little skilled medical care. His personal expenses will be to provide himself with housing, food, and nursing and custodial care of the kind provided in a nursing home. That is the expense covered by the award for future medical expense. The label should not be permitted to mislead us, for, in truth, the judgment requires the United States to pay the plaintiff's personal living expenses twice. Thus, the award for lost earnings, as finally determined, should be reduced by the amount of the award for future medical expenses."

718 F.2d at 112. In other words, in *Flannery*, the court reduced the award to plaintiff for lost earnings because the award duplicated the award of future medical expenses. The plaintiff's award in *Flannery*, then, was not adjusted for consumption, but was adjusted for an amount already considered in the award of future medical expenses. The issue the *Flannery* court addressed in this respect was one of double recovery, and not one of deduction for consumption as a *per se* rule.

Since the plaintiff in this case, Mrs. Burke, is not now comatose and would not be expected to be comatose, during the entirety of whatever period of life remains to her, the general rule that personal consumption expenses should not be deducted from future lost earnings in the case of a living plaintiff would seem to be the rule which should be applicable here.

6. *Reduction to Present Value of Future Earning Capacity*

In Maryland, the law presently is that in a personal injury action, as well as in a wrongful death action, any damages awarded for loss of future earning capacity must be reduced to present value. *Walston v. Sun Cab Co.*, 267 Md. 559, 574–75, 298 A.2d 391 (1973) (wrongful death action); *Dennis v. Blanchfield*, 48 Md.App. 325, 333, 428 A.2d 80 (1981), *modified on other grounds sub. nom., Blanchfield v. Dennis*, 292 Md. 319, 438 A.2d 1330 (1982) (personal injury action). That rule is applicable here.

### 7. Deduction of Federal Income Taxes

■ The Fourth Circuit has held that it is appropriate in a Federal Tort Claims Act case to deduct federal income taxes on the projected lost earnings in computing lost future earnings, particularly since the damage award itself is tax-free. *Flannery v. United States*, 718 F.2d at 111–12. The relevant income stream which will be lost by a plaintiff is of after-tax wages and benefits, and requiring the federal government to pay a plaintiff money which would normally have been paid ultimately by the plaintiff in federal taxes would amount to a windfall to the plaintiff, punitive to the defendant. As the dissenting opinion in *Flannery* makes clear, the rationale for this decision must be that failure to deduct federal taxes would be punitive to the defendant since the State law applicable in *Flannery* would not have required such a deduction. 718 F.2d at 113–15.

### 8. No Adjustment for Income Taxes on Income of Invested Funds

Furthermore, the Fourth Circuit, in *Flannery*, held that no adjustment should be made in a Federal Tort Claims Act case for income taxes payable on income on invested funds after the judgment is paid. The reason for this is that funds could be invested in whole or in part in tax-exempt securities. *Id.* at 112. While following the lead of the Fourth Circuit in this respect, the Fifth Circuit in *Sosa v. M/V Lago Izabal*, 736 F.2d 1028, 1034 n. 5 (5th Cir. 1984), not a Federal Tort Claims Act case, refined that proposition by holding that the district court should take into account the lower interest rates of tax-exempt securities in comparison to most other securities when fashioning the damage award.

### 9. No Deduction of State Income Taxes

■ As previously noted, state law as to the measure and calculation of damages is applicable to causes of action brought under the Federal Tort Claims Act, except where damages under that law would be punitive in nature. Although a Federal Tort Claims Act award for future loss of earning capacity must be adjusted for United States taxes in order that it not be punitive in nature, no decision in a similar vein has been found relating to the State taxes. The reasoning behind the federal income tax exception is not applicable to State taxes. State taxes are strictly between the plaintiff and the State. They are of no legitimate concern to the United States Government as a defendant. Although the defendant might contend that, because the award is not taxable, a windfall is given the plaintiff, this argument has a reverse effect. Any adjustment for State taxes would be punitive in nature only to the plaintiff. It would allow a windfall for the United States Government and "would nullify the congressional intent to give the injured party the benefit of tax-free income." *Lumber Terminals, Inc. v. Nowakowski*, 36 Md.App. 82, 97 n. 9, 373 A.2d 282 (1977). Although the Maryland Court of Appeals has not ruled on the validity, as a matter of law, of the *Lumber Terminals* analysis, *see Blanchfield v. Dennis*, 292 Md. 319, 323 n. 5, 438 A.2d 1330 (1982), in the absence of such authority this court will accept *Lumber Terminals* as correctly stating Maryland law.

### 10. Loss of Enjoyment of Life

■ There is also a question in this case as to whether or not the provision of 28 U.S.C. § 2674 prohibiting punitive damages in a Federal Tort Claims Act case would make any award for "loss of enjoyment of life" inappropriate. In *Flannery v. United States*, 718 F.2d 108 (4th Cir. 1983), such an award was determined to be punitive because the plaintiff therein was permanently comatose. The court held:

"It is perfectly clear, however, that an award ... for the loss of enjoyment of life cannot provide him with any consolation or ease any burden resting upon him.... He cannot use the [amount of the award]. He cannot expend it upon necessities or pleasures. He cannot experience the pleasure of giving it away.

If paid, the money would be invested and the income accumulated until [his] death, when it would be distributed to those surviving relatives of his entitled to inherit from him. If it is compensatory in part to anyone, it is compensatory to those relatives who will survive him."

718 F.2d at 111.

The *Flannery* court, therefore, held that such an award in those circumstances would be punitive in nature, because it would grant to the living plaintiff more than the actual loss suffered by him. Such an award was deemed by the *Flannery* court to be compensatory to his surviving relatives rather than to the living plaintiff since the plaintiff could not in any way enjoy the amount of the award.

In the present case, however, Mrs. Burke is not comatose and has the present ability to obtain benefit from any such award. Accordingly, she is entitled to consideration of the effect her injuries have on her overall physical and mental health and well-being in the enjoyment of life during the remaining period of her life and to have an award of damages considering the same.

## 11. *Future Medical Expenses*

■ The last question of law remaining, in deciding upon the proper measure of damages in this case, is that relating to future medical expenses. The plaintiffs are not claiming entitlement to a damage award for past medical expenses [2] since the defendant United States provided free all hospital and medical care which Mrs. Burke has received for the specific condition for which the defendant is responsible. It seems that the plaintiffs correctly assessed the law in not seeking any compensation on a "collateral source rule" theory for reasonable costs of past hospital and medical care. *See United States v. Brooks*, 176 F.2d 482, 484 (4th Cir.1949); *Feeley v. United States*, 337 F.2d 924, 927 (3d Cir. 1964).

The plaintiffs are claiming, however, entitlement to a damage award for anticipated future hospital, medical and related expenses. The defendant argues that it has in the past provided and will in the future provide all necessary medical and hospital care for Judith Burke and that, therefore, no recovery for such expenses is appropriate under the "collateral source rule" or any other rule.

The starting point for an analysis for the applicability of the collateral source rule is of the law of the state, in this instance, the law of Maryland. *United States v. Price*, 288 F.2d 448, 449 (4th Cir.1961). The leading decision in Maryland establishing a collateral source rule is *Plank v. Summers*, 203 Md. 552, 102 A.2d 262 (1954). In that case, the plaintiffs were injured in an automobile accident for which defendant Summers, a private citizen, was liable. All plaintiffs were enlisted in the United States Navy and received free medical care for their injuries. The Maryland Court of Appeals held that the plaintiffs could recover for services gratuitously provided by a *third party*. *Id.* at 562, 102 A.2d 262. That decision neither reached nor discussed the applicability of the collateral source rule where both the benefit and recovery flow from the same party.

In *United States v. Brooks*, the Fourth Circuit considered the application of North Carolina damages law in a Federal Tort Claims action where the plaintiffs were awarded damages from the United States for future lost earnings, and concurrently received from the Veterans' Administration monthly disability payments. The court stated:

"It seems perfectly clear that in making the award of damages to plaintiffs nothing should be included on account of hospital or medical expenses which the government has paid or on account of loss of earning power for the period from which he has drawn Army pay. It seems equally clear that the award should be

---

**2.** Actually there was evidence of a bill for bone and liver scans, performed on November 19, 1984, by Nuclear Services-Hem.Onc. Assoc.,

Ltd., in the amount of $524.00. The plaintiff is entitled to an award for this amount.

diminished by the amount which he has received *or is to receive from the government by way of disability benefits* . . . .

We recognize that prospective disability payments are uncertain in that the government may withdraw or decrease them at any time, but the uncertainty is no greater than that involved in any other matter affecting damages in personal injury cases; and the trial court must deal with it as it deals with other uncertainties by using its best judgment after all the facts and circumstances of the case have been taken into consideration."

176 F.2d at 484 (emphasis supplied).

In *United States v. Price,* the Fourth Circuit considered whether a civil service annuity should be set-off against damages to avoid a potential double recovery in an FTCA case. Applying Virginia law, the court found that civil service retirement benefits are "essentially from a collateral source, and therefore ... should not be taken into account in computing tort damages." 288 F.2d at 450. The court observed that civil service retirement benefits are paid from a fund separate and distinct from the general treasury. The fund is made up of contributions by employees and appropriation equal to payroll deductions:

"These retirement payments are entirely separate from the Government's acknowledged statutory duty as tortfeasor to pay any injured person for particular injuries resulting from negligence imputed to it. The two types of payments come from different sources, since tort payments are made from general revenues, while retirement benefits, on the other hand, are from the fund created in part by the employees themselves."

*Id.* at 451.

The court in *Price* also cited with approval *United States v. Harue Hayashi,* 282 F.2d 599 (9th Cir.1960), which determined that federal Social Security benefits should not be credited or set-off against FTCA damages. In the context of the collateral source rule, the Ninth Circuit held that benefits from a special fund which were supported by contributions of the beneficiary or his or her relatives are legally distinguishable from benefits payable from unfunded general revenues, *id.* at 603, such as the hospitalization and the disability payments discussed in the *Brooks* case. The reasoning of the *Price* decision was applied in the context of Maryland law in *Jennings v. United States,* 291 F.2d 880, 887–88 (4th Cir.1961).

Thus, it is clear from *United States v. Price* and *Jennings v. United States* that under certain circumstances payments received from the United States can be considered as being received from a "collateral source" even when the United States is the defendant in a Federal Tort Claims action. It appears, however, that if the benefits are received from an unfunded source, drawn from general revenues to which the injured party makes no direct contribution, the rule of *United States v. Brooks* applies to foreclose double recovery.

In the instant case, there is no suggestion that plaintiff in any way contributes to a fund which supplies her with future hospital benefits. It is undisputed that military hospitals receive funds appropriated for current operations of the Department of the Defense, drawn from general revenues, as are veterans benefits. *See, e.g.,* Pub.L. No. 98–94, § 301(b), 97 Stat. 614, 635 & 648 (1983) (Appropriation for Department of the Navy, Fiscal Year 1984). Because this is a non-contributing, wholly revenue-funded program, plaintiff cannot set up these future benefits as a collateral source.

Plaintiffs argue, citing *Feeley v. United States,* 337 F.2d 924 (3d Cir.1964), that Mrs. Burke should not be compelled to use federal medical facilities, notwithstanding the inapplicability of the collateral source rule. There, the court analyzed whether Pennsylvania law would compel the application of the collateral source rule to veterans benefits in a Federal Tort Claims action. The Court of Appeals for the Third Circuit determined that Pennsylvania law would prohibit the application of the collateral source rule for *past* veterans benefits

received and would thereby preclude a double recovery against the United States. In this regard, the court in *Feeley* closely followed the reasoning of the Fourth Circuit in *United States v. Brooks* by stating:

"We are of the view that the decision of the Court of Appeals in *Brooks, supra*, is correctly decided and should be followed. The defendant United States has provided free hospital care for these specific injuries. While it is true that the plaintiff became entitled to the benefits because of his status as a veteran and his pre-existing service-connected disability, and not because he was the victim of a tort committed by a federal employee, the fact is that the United States has paid for the hospital care here in dispute, while the plaintiff has paid nothing for the care. To allow the plaintiff to recover this item in his damages would not only result in a double recovery for him, but also a double-payment out of the general treasury by the United States."

337 F.2d at 933–34.

The Third Circuit departed from the *Brooks* rationale, however, with regard to future medical damages. The court expressed its view that it would be unreasonable to compel a plaintiff to choose in the future between continued use of public hospitals and bearing the expenses of future medical cost himself, saying:

"A victim of another's tort is entitled, we think, to choose, within reasonable limits, his own doctor and place of confinement, if such care is necessary. To force a plaintiff to choose between accepting public aid or bearing the expense of rehabilitation himself is an unreasonable choice. The plaintiff may not be satisfied with public facilities; he may feel that a particular private physician is superior; in the future because of overcrowded conditions he may not even be able to receive timely care. These are only a few of many considerations with which an individual may be faced in selecting treatment. The plaintiff's past use of the government facility does not insure his future use of them. He will now have the funds available to him to

enable him to seek private care, he should not be denied this opportunity.

It is true that if the plaintiff should decide to seek care from the Veterans' Administration, the defendant may well be paying twice for the same element of damages. However, this is dependent upon whether the government can refuse to render free care. This factor, however, should not be a consideration in awarding damages under the Federal Tort Claims Act, but rather as a policy judgment to be made in the administration of veterans' benefits."

337 F.2d at 935.

While this court generally agrees that a plaintiff, within reasonable limits, has a right to a doctor and hospital of his or her choice, it is also mindful that 28 U.S.C. § 2674, prohibiting punitive damages in a Federal Tort Claims Act case, has been read liberally by the Fourth Circuit to guard against double recovery from the government and to ensure that a plaintiff recovers for only actual loss. *Flannery v. United States*, 718 F.2d at 111. In view of the fact that Mrs. Burke, as the spouse of a retired member of the Navy, is eligible for benefits under the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), *see* 32 CFR § 728.31 (1984), the court believes that the impact of that program cannot be ignored and should be considered in conjunction with an award of future medical expenses. This program provides, in essence, free medical insurance to dependents of retired military personnel who for some reason must utilize non-military medical facilities. After payment of a small annual deductible, the dependent is responsible for payment of only twenty-five percent of reasonable medical expenses with the Government paying the balance. 32 CFR § 199.10(f)(3). The court concludes that, in order to prevent double payment by the defendant and to attempt to ensure recovery only for actual loss to the plaintiff, the plaintiff is entitled to recover only twenty-five percent of her reasonably probable future medical and hospital expenses.

## 12. *Loss of Consortium*

The plaintiffs, Mr. and Mrs. Burke, have a joint right to recover damages for any injury to their marital relationship caused proximately by the negligence of the agents of the defendant. Such a loss of consortium award, since it is based on a joint cause of action, is limited to the period between the occurrence of the injury and the expected date of death of Mrs. Burke as a result of the injury. It is measured by the injury to the joint marital relationship, including loss of society, affection, assistance, conjugal fellowship and impairment or loss of sexual relations. *Deems v. Western Md. Ry. Co.*, 247 Md. 95, 100, 231 A.2d 514 (1967).

## B. *The Facts*

If the condition of Mrs. Burke had been properly diagnosed in April of 1981, it is likely that she would have had at that time a modified radical mastectomy. The time which she spent in the hospital in October, 1982 for the actual surgical procedure and for recuperation therefrom would have occurred irrespective of the negligence of the defendant's agents. Similarly, the disfigurement from that operation would also have occurred without regard to the aforesaid negligence. The defendant, therefore, cannot be liable for damages for those circumstances.

On the other hand, it is likely that Mrs. Burke would not have been required to have had radiation or chemotherapy treatments if her operation had taken place in April, 1981, rather than in October, 1982. She is entitled, therefore, to damages for the pain and suffering and other consequences resulting to her from those treatments.

## 1. *Medical Expenses*

The radiation therapy which was given decreases the likelihood of recurrence of the cancer in the localized area of the chest wall only. It does not prevent recurrence of the cancer elsewhere. The chemotherapy treatment which was given, based upon the present state of medical knowledge, does not increase the ultimate chances of survival. Such chemotherapy treatments at best delay recurrence of cancer in the body but do not reduce the likelihood of ultimate recurrence.

The usual pattern of recurrence in the chest wall has been reduced by the radiation therapy. While there was a conflict in the medical evidence in this regard, the court finds that it is reasonably probable that the site of recurrence will be in the skeletal system. Organs such as the liver, lung, and brain are the next most likely sites of recurrence.

Bone metastases frequently remain localized for as long as three to four years with resulting multiple fractures and bone pain, requiring radiation therapy and multiple hospitalizations. Radiation and prophylactic maintenance on drugs are expected to arrest the disease for 12 to 18 months, but the majority of patients relapse after that period. As the disease progresses, thoracic and lumbar spine involvement associated with multiple compression fractures is likely. Growth of the tumor from the body of the vertebrae into the spinal cord with resulting spinal cord compression and paraplegia are common with disseminated bone metastases. Hyperglycemia is another common effect of widespread bone metastases, accompanied by nausea, vomiting, constipation, stupor, aberrant behavior and other problems.

If the liver becomes involved as a recurrence site of the cancer, the patient would probably die within a year of the recurrence. Hospitalization in such circumstances would occur for a period of from three to six months intermittently as a result of the numerous complications accompanying liver disease. Side effects of cancer of the liver include, among other things, severe lethargy and anorexia.

If the cancer were to recur in the lung, the patient would most likely survive less than a year from recurrence. In lung cancer, there is a tendency to have pleural effusions which require hospitalization with chest tubes inserted to sclerose the

pleural space. Lung cancer is accompanied by shortness of breath, requiring oxygen to be administered at home.

Mrs. Burke has not been told the details of the probabilities of recurrence of her cancer nor of her ultimate premature death. She is aware from what she has been told, however, that the cancer will probably recur and that her life expectancy has been shortened.

With any of the likely sites of recurrence, Mrs. Burke would be required to have considerable in-patient treatment. The probable future cost of medical, hospital, and other ameliorative treatment will be at least $300,000.00.

As a result of her husband's service in the Navy, Mrs. Burke has received substantially all of her past treatments in connection with her cancer without expense to herself or her husband. The plaintiff has stipulated that she is entitled to free medical care at federal government facilities as long as she is married to Mr. Burke. Under the CHAMPUS program, in addition, in the event that federal governmental facilities are not available to provide the necessary care, 75% of all expenses at private facilities over a small annual deductible are compensable by the federal government. For this element of damages, Mrs. Burke will be awarded $75,000.00.

#### 2. *Lost Wages*

Judith Burke, a native of New Zealand, did not come to the United States until 1980. When in New Zealand, she had worked off and on, primarily on a part-time basis.

After she and Mr. Burke moved to Manassas, Virginia, in the latter part of 1980, Mrs. Burke, a vivacious and physically attractive woman, decided that she would return to work. She started work in February, 1981 with Battlefield Builders in Northern Virginia as a hostess. She became interested in real estate sales as a consequence. She took a two-week course in March, 1981 and obtained her real estate sales license in August, 1981. At that time, she became sales manager for Battle-

field Builders in the Montclair subdivision in Dumphries, Virginia. As a sales manager, Mrs. Burke was permitted to sell homes for Battlefield. In the calendar year 1981, she earned $7,920 working as a sales hostess and sales manager for Battlefield Builders.

In 1982, Mrs. Burke continued working as a sales manager for Battlefield Builders. She was extremely successful, but was required to work many evenings and most weekends. During this time, she had very little opportunity to be with her family, because the work schedule which she followed and the work schedule of her husband conflicted to a great extent. Because of her medical condition, which she learned about on October 14, 1982, and the resulting impending surgery, Mrs. Burke resigned her position with Battlefield Builders as of October 17, 1982. In the calendar year 1982, Mrs. Burke earned $25,275 working as a sales manager for Battlefield.

In her first full year of selling new homes for Battlefield Builders, between approximately September of 1981 and September of 1982, Judith Burke's sales volume exceeded 3.2 million dollars, placing her among the top performers in the geographical area. During this period, the real estate market was somewhat depressed as a whole. Judith Burke's sales production in her first year placed her in the top 5% to 10% of salespersons in sales of new homes in the Northern Virginia area. She consistently outsold the eight other sales managers who were competing in the new home sales market in the Montclair project.

The effects of adjuvant radiation and chemotherapy with its side effects of morbidity initially prevented Mrs. Burke from returning to employment with Battlefield Builders. The 12 four-week cycles of chemotherapy created nausea and vomiting for at least three days of the first week and for a lesser period of the second, third, and fourth weeks of each cycle. Nevertheless, because of financial pressures on her family, she went back to work as a part-

time sales manager for C.B.H. Corporation in Northern Virginia from February, 1983 through early October, 1983, during which period she sold over 1.2 million dollars' worth of new homes.

In October, 1983, Mrs. Burke returned to full-time employment with Battlefield Builders as a sales manager of the Minnieville subdivision in Manassas, Virginia.

In the calendar year 1983, Mrs. Burke earned $12,900 from C.B.H. Corporation and $3,600 from Battlefield Builders.

For the first six and a half months of 1984, her sales volume approached four million dollars. Based on a 1% commission on new home sales, her income for 1984 from commissions exceeded $30,000. In July, 1984, Mrs. Burke resigned from Battlefield Builders, stating in her letter of resignation that she was leaving to help her husband in his business as a *Washington Post* distributor. Mr. Burke had retired from the Navy and had started a business in early 1984 as a *Washington Post* distributor.

One of the reasons which Mr. Burke gave for starting his business, rather than accepting a job offer in his area of expertise, logistical management, was to remain at home with his wife and family as a result of the shortened life expectancy of Mrs. Burke.

Mrs. Burke, for her part, in July, 1984 and continuing through the time of the trial in this case, had no physical impairment or disability which prevented her from continuing her real estate sales career. She decided, however, that she wished to spend as much time as possible with her husband and son, due at least in part to the uncertainty of her future health. She has been helping her husband with his business, the income of which increased steadily in the months prior to the trial of this case. She receives no monetary compensation, however, beyond that which is the net income from the distributorship business and which is shared by the family.

Since Mrs. Burke is presently physically able to earn income in her chosen field of real estate sales, the question arises as to whether or not she is entitled to damages for loss of earnings to the present time from July, 1984, when she resigned from Battlefield Builders and, as well, whether she is entitled to damages for loss of earning capacity in the future. The question is a very difficult one.

"A plaintiff who is unable to continue earning wages because of an injury may recover damages for either or both: (1) loss of time or earnings; and (2) loss or impairment of earning capacity.

Generally, loss of time or earnings compensates for regular wages lost because of the disability, while loss or impairment of earning capacity compensates for all monies that *could* have been earned but for the injury, not only those that *would* have been received in the form of wages."

*Damages in Tort*, Vol. 2, § 10.00 at 10–4 (1984) (emphasis in original); *see also Adams v. Benson*, 208 Md. 261, 271, 117 A.2d 881 (1955).

Thus, it appears that two questions must be answered:

(1) Has the plaintiff lost actual wages because of the injuries she suffered?

(2) Has the plaintiff's earning capacity been diminished, and, if so, to what extent?

a. *Lost Actual Wages*

The plaintiff clearly lost wages or income during her treatment and recovery between November, 1982 and October, 1983. Although she worked part-time for part of that period, she lost earnings by virtue of the fact that the radiation and chemotherapy treatments prevented her from working a full-time schedule. Based on all the evidence, the court concludes that the loss of earnings during that period, as a direct result of the negligence of the defendant's agents, was $38,000.00.

In addition, Mrs. Burke's earnings were reduced to a lesser extent between November and the end of December, 1983 when her chemotherapy treatments ended. From all the evidence, the court concludes

that Mrs. Burke lost $4,000.00 during that time.

From the end of December, 1983 through July, 1984, Mrs. Burke worked extremely hard, working many evenings and weekends. She suffered no loss of earnings during that time frame.

■ When the plaintiff decided to resign from Battlefield Builders in July, 1984 and elected to remain at home with her family and to work in her husband's business, she was physically and mentally capable of continuing to work. She voluntarily elected to spend more time with her husband and child, probably, at least to some extent, motivated by the uncertainty in her mind as to the future course of her health.

"As with other items of damage, plaintiff must show that the loss of earnings was attributable to those injuries sustained due to defendant's wrongful conduct. Other motivations for discontinuing employment, such as a desire to devote time to other pursuits, are obviously insufficient to support an award for lost earnings."

*Damages in Tort Actions, supra,* § 10.13 at 10–13.

Although no Maryland cases directly on point have been found,[3] several cases from other jurisdictions aptly illustrate the proposition. In *Dykes v. State Farm Mutual Automobile Insurance Co.,* 248 So.2d 603, 607–08 (La.App.1971), the court allowed no recovery for lost wages where the plaintiff did not return to his job selling automobiles and insurance, because he wanted to devote more time to his evangelistic work. Also in *Mazzucco v. Krall Coal & Oil Co., Inc.,* 172 Conn. 355, 374 A.2d 1047, 1049 (1977), the court disallowed recovery for lost earnings since other factors, such as the illness of his wife which took him away from his business, contributed to the plaintiff's loss of earnings. In *Union Carbide Corp. v. Gayton,* 486 S.W.2d 865, 869 (Tex. Civ.App.1972), the plaintiff was denied recovery for lost earnings where there was evidence that failure to return to work was for personal reasons.

Since the court is unable to quantify the percentage of the plaintiff's decision to stop work which was motivated by her general desire to spend more time with her son and husband and her desire to assist her husband in the operation of his business as opposed to the motivation to spend more time with her family as a direct and proximate result of her belief that her life span would be shortened, no award can be made by the court for lost earnings between July, 1984 and the date by which, to a reasonable probability, the plaintiff, as a result of the negligence of the defendant's agents, will cease to be able to work, even if she wished to do so.

b. *Loss of Earning Capacity*

"Impairment of earning capacity means the diminution or loss of the ability to earn money .... The impairment is measured by the present value of the impairment or loss of general earning capacity, not by loss of wages or earnings in a specific occupation, although consideration is generally given to evidence of plaintiff's earnings prior to the injury. The amount recoverable is the difference between the amount of money which the plaintiff was *capable of earning* before the injury and the amount which he or she is capable of earning thereafter."

*Damages in Tort Actions, supra,* § 10.21 at 10–21–22 (emphasis in original) (footnotes omitted).

■ In order to determine the amount of an award for impairment of earning capacity, two decisions must be made, "namely, determination of the existence of impairment and assessment of the consequences—or loss—resulting from the impairment." *Id.,* § 10.22[1] at 10–29. The existence of the impairment can be shown

---

**3.** Maryland appears to recognize the principle that a trier of fact can consider relevant evidence regarding the decision of a plaintiff not to return to work and to use such evidence to mitigate the damages owed by a defendant. *See Kelch v. Mass Transit Administration,* 42 Md. App. 291, 296, 400 A.2d 440 (1979), *aff'd,* 287 Md. 223, 411 A.2d 449 (1980).

by proof that the injury is permanent. *Id.*, § 10.22[2] at 10–33–34. *See also Bender v. Popp*, 246 Md. 65, 73, 227 A.2d 237 (1967); *Adams v. Benson*, 208 Md. 261, 271, 117 A.2d 881 (1955); *Levin v. Arrabal*, 11 Md. App. 89, 99, 272 A.2d 818 (1971), *pet. denied*, 261 Md. 726 (1971).

In the case at bar, the impairment is the probability that the plaintiff will develop cancer again in the future which will ultimately result in her death within 10 years from October, 1982.

> "If the condition of a person injured is such that a shortening of life may be apprehended this may be considered in determining . . . the consequent disability to earn a living. . . ."

4 Southerland, Damages at 4655 (4th ed. 1916), cited with approval in *Rhone v. Fisher*, 224 Md. 223, 231, 167 A.2d 773 (1961). Another court has described the method of calculating loss of earning capacity due to shortened life expectancy in this way:

> "In calculating the appropriate compensation, the Court must determine whether and to what extent there has been a 'loss of earning power and of ability to earn money.' More is involved than comparing the amount earned before and after the injury. The test is whether 'the economic horizon of the [Plaintiff] has been shortened because of the injuries . . . .' "

*Funston v. United States*, 513 F.Supp. 1000, 1006 (M.D.Pa.1981) (citations omitted).

The economic horizons of Judith Burke definitely have been shortened. Although she is today without clinical evidence of breast or other cancer, and is capable of returning to work with her earning capacity unimpaired, there will, to a reasonable probability, come a time in the not too distant future when she will not be able to work. Although the exact date of the occurrence of that event cannot be stated with certainty, it is not too speculative, *see Adams v. Benson*, 208 Md. at 271, 117 A.2d 881; *United Mine Workers of America v. Patton*, 211 F.2d 742, 749 (4th Cir.), *cert. denied*, 348 U.S. 824, 75 S.Ct. 38, 99 L.Ed.

649 (1954), to state that, based upon the evidence in this case, the disease will probably recur, and that as a result of the recurrence her ability to work will be impaired at least within five years from October 19, 1984, and that her death as a further result of the disease recurrence will probably occur within eight years of October 19, 1984.

Therefore, while no impairment of earning capacity exists at the present moment, that impairment will arise by October 19, 1989 and will thereafter deprive the plaintiff totally of her future earning capacity.

■ To calculate the amount of future earning capacity lost, the trier of fact can consider "plaintiff's earning capacity before the injury, the probable duration of such capacity, and how far the injury will probably disable her from engaging in those occupations for which she would have been qualified in the absence of the injury." *Adams v. Benson*, 208 Md. at 271, 117 A.2d 881. To put it another way, "[t]he extent of the plaintiff's impaired earning capacity is measured by the difference between the value of the plaintiff's services as they will be in view of the injury and as they would have been had there been no injury. Earning capacity is not necessarily determined by *actual* loss of earnings but by what plaintiff *could* have earned even if he or she never worked to that capacity in the past." *Damages in Tort Actions, supra*, § 10.22[3] at 10–44–45 (emphasis in original).

This court concludes by a preponderance of the evidence that the plaintiff would have been physically, emotionally, and socially able to work, at least part time, in the real estate industry as a salesperson after October 19, 1989, earning the present equivalent of $30,000 per year after expenses but before taxes and that this opportunity has been denied her by virtue of her probable disablement by the recurrent cancer by October 19, 1989 and ultimate death thereafter. He work life expectancy, measured as of October, 1984, would have been 12.6 years from October 19, 1989. Thus her earning capacity has been dimin-

ished to that extent from October 19, 1989 for 12.6 years thereafter.

The award for lost earning capacity must be reduced to present value. This calculation reducing the award to present value will assume a deduction of federal taxes and no deduction of state taxes on the annual earning capacity lost, will assume a discount rate of 10.1% on the principal and of 6.27% on reinvested income, and will also assume a 6.55% per year earnings growth. As previously stated, there will be no deduction from the annual earning capacity lost for personal consumption during those years. Based on that calculation, the present value of the loss of earning capacity will be determined by the court. The parties are directed to have their respective economist experts make the aforesaid calculation and to advise the court of the results of said calculations and the details thereof within two (2) weeks.

### 3. *Pain and Suffering*

Of course, the plaintiff, Judith Burke, has suffered physical and mental pain from the radiation and chemotherapy treatments. She has suffered mental anguish from her awareness that her cancer will probably recur, and she will suffer increasing mental anguish as she becomes more aware of her condition until her death. It is likely that she will also suffer physical pain between the date of the recurrence of her cancer and her death. For this mental and physical pain, she is entitled to an award of $85,000.00.

### 4. *Seriousness of Injury and Effect on Enjoyment of Life*

There was little evidence of any particular pursuits of Mrs. Burke in which she takes special pleasure. There was evidence that she is a loving mother and wife, concerned about her ability to provide emotional support and physical companionship to her family. Her ability to provide these things to her family during her period of treatments following her operation in October, 1982 was impaired as a result of her debilitated physical and emotional condition

at that time. Her impaired ability in that regard reduced her enjoyment of life in a real and concrete sense and is compensable, difficult as it is to place a monetary value on so personal a loss.

Similarly, she will suffer the same type of loss when she becomes ill from the recurrent cancer, probably before November, 1989 and that loss will continue until her probable death by October, 1993.

The court believes from the evidence that this element of damages can and should be conceptually separated from the general mental pain and anguish for which an award has already been determined and from the joint injury to the marital relationship for which an award is later announced in this Memorandum. This element of damages for loss of an enjoyment of life, however, has been considered by the court in deciding upon the amount of an award for the nature and seriousness of the physical injury she has sustained by virtue of the negligence of the defendant's agents and the manner in which that injury has affected and will affect her overall physical and mental health and well-being. The award for those elements of damage is $500,000.00. In arriving at a monetary award for these elements of damage, the court hastens to caution, the court has not enhanced the award in any way by an amount which might be said to compensate the plaintiff for the shortening of her life *per se.*

### 5. *Loss of Consortium*

The last matter on which the court must place a monetary amount under the law and evidence in this case is in regard to the joint cause of action of Mr. and Mrs. Burke for the joint injury to the marital relationship. Although the evidence discloses substantial disruption of the marital relationship during her chemotherapy and radiation treatments from November, 1982 through December, 1983, including total cessation of sexual relations between the parties for that period, Mr. and Mrs. Burke now have gradually restored their previously good sexual and emotional relation-

ship. As Mrs. Burke begins to suffer morbidity in the future, however, as a result of her probable recurrence of cancer, the marital relationship will certainly suffer substantial injury, increasing in intensity as she progresses inevitably to her death. For that joint injury the court awards $100,000.00, aware, of course, that no amount of money can adequately compensate for the loss.

A judgment will be entered by the court in accordance with this Memorandum when the further evidence is received relating to the calculation of the present value of the loss of earning capacity. To that extent, the record will be reopened, and, if further testimony is necessary, directed only to the question of whether the calculations produced by the economist experts comport with the court's instructions herein, such testimony will be hereafter scheduled.

It is ORDERED this 21st day of March, 1985, that the parties have their respective economist experts make the calculation relating to the present value of the loss of future earning capacity of Judith Burke as directed herein and supply the court with the results of said calculations, and the details thereof, within two (2) weeks.

The Clerk shall mail a copy of this Memorandum and Order to counsel for the parties.

## PARTIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

The court having been advised by counsel for the government that he agrees that the sum of $199,464.00 is the correct mathematical product of calculations using the findings of the court entered on March 21, 1985 relative to the present value of the lost earning capacity of the plaintiff, Judith R. Burke, the court concludes and finds as a fact that the present value of the lost earning capacity of Judith R. Burke as a result of the negligence of the defendant is the sum of $199,464.00.

## JUDGMENT

Based upon the findings of fact and conclusions of law heretofore entered in this case on March 21, 1985 and on April 10, 1985, judgment is hereby entered for Judith R. Burke against the United States of America in the sum of $901,988.00, and judgment is further entered on behalf of Judith R. Burke and James W. Burke, jointly, against the United States of America in the sum of $100,000.00.