# WILLIAM L. HUFF *v.* JAMES W. HARBAUGH ET AL.

[No. 1, September Term, 1981.]

*Decided October 7, 1981.*

The cause was argued before GILBERT, C. J., and MORTON and THOMPSON, JJ.

*Conrad W. Varner* for appellant.

*Darrow Glaser* for appellees.

THOMPSON, J., delivered the opinion of the Court.

This is an appeal from the judgment entered by the Circuit Court for Washington County in favor of the appellees, James W. Harbaugh, et al., against the appellant, William L. Huff, in the amount of $25,550. Judgment was also entered in favor of Nationwide Insurance Co., co-defendant below. Harbaugh did not appeal.

## I Facts

William Huff and Charles Harbaugh had known each other for thirty-five years. When Huff became an insurance agent twenty-four years ago, Harbaugh transferred all of his personal and business insurance to him. Almost all of the transactions between the two parties were conducted by telephone. The general mode of these transactions consisted of Harbaugh calling Huff to inform him that he had bought, or was buying, a building and required insurance. Huff would then advise Harbaugh that he would "take care of it." Some time thereafter, Harbaugh would receive a policy in the mail. On at least one occasion when Huff was not able to place insurance with his company, he arranged for insurance coverage elsewhere. In the twenty years in which Huff served as Harbaugh's agent, no request for the procurement of insurance had been refused.

In February 1973, Charles W. Harbaugh and his two sons purchased property in the City of Hagerstown, Maryland,

located at 25-29 South Potomac Street, for the sum of $30,000. In order to finance the purchase of this property, Harbaugh, then retired, arranged for a mortgage loan through the Hagerstown Trust Company, such mortgage including two other properties owned by him on South Mulberry Street. Settlement was held on February 28, 1973. As Harbaugh was a customer of long-standing, the loan officer of the bank proceeded with settlement even though Harbaugh did not have a written policy or binder showing his or the bank's interest as was generally required. Harbaugh testified that he telephoned Huff on the day of settlement, asked for $30,000 coverage against fire loss, and was told by the appellant, "O.K., I got it — I'll take care of it as usual." Thereafter, Hagerstown Trust received insurance policies from Huff covering the buildings on South Mulberry Street, but no policy was received with respect to the South Potomac Street property.

On December 7, 1973, the appellees obtained a second mortgage from the Hagerstown Trust Company secured on the same properties encumbered by the mortgage dated February 28, 1973. During this settlement, the bank's mortgage loan officer noticed that the Bank had not received an insurance policy on Harbaughs' South Potomac Street property. She thereupon placed a telephone call to the appellant, Huff, and handed the phone to the settlement attorney who advised Huff that the settlement could not be concluded without the required insurance. After this telephone conversation, the settlement was completed. On several occasions following the December 7 settlement, the mortgage loan officer telephoned Huff to inquire as to the insurance on the South Potomac Street property. In each instance, she was informed by Huff that there was insurance coverage and that the policy would be forthcoming.

On February 7 and 8, 1974, the Harbaugh property at 25-29 South Potomac Street was extensively damaged by fire. Glen Miller, Vice President of the Hagerstown Trust Company, upon learning of the fire, called Huff and was again assured that the building was covered and that the

Hagerstown Trust Company was the loss payee. The building was not, in fact, insured.

Damage to the building was from two sources — the fire, which had spread from the adjoining property, and the negligent demolition of such neighboring property. A real estate appraiser valued the structure prior to the fire to have been between $37,000 and $40,000. Mr. Norman Earley, Jr., a commercial contractor who also appeared at trial, placed the cost of repairs to put the building in substantially the same condition as it was prior to the fire to be in excess of $63,000. This estimate did not include cost to repair the hole in the wall caused by the adjoining property's demolition crew.

The appellees instituted suit on December 1, 1976, against RKO Theaters, Inc., owners of the adjoining property, and Victor C. Ditto, the contractor who undertook the demolition of the RKO property, for damages resulting from the fire of February 7 and 8, 1974, and the subsequent demolition of the RKO property. RKO and Ditto subsequently settled their case by the payment of $25,250 and obtained a release from the appellees which provided in pertinent part:

"5. The Releasors are willing to and hereby do, release the Releasees only for all past or present claims for all damages arising from said occurrence and specifically including those amounts of damage claimed by Releasors for the loss by Releasors of rental income, loss and damage to the personal property owned by the Releasors in the tavern portion of the building, damage to the concrete sidewalk, repair and relocation of the air conditioning in the tavern portion, the puncturing of the north wall, the time, expense and inconvenience in connection with the processing of the claim, certain items of cost and fees, excluding attorney's fees, in connection therewith, in the total compromised amount of TWENTY FIVE THOUSAND TWO HUNDRED FIFTY DOLLARS ($25,250.00)."

"6. It is the express understanding therein that Releasors are releasing their claims against the

Releasees, only, and this release and compromised amount is not intended to be, nor shall it be construed to be, a release of any insurer, insurance company or insurance agent or broker, for any failure to place or provide insurance coverage for the property, which cause of action, if any, is expressly reserved to the Releasors."

RKO subsequently contributed $23,000 and Victor C. Ditto paid $2,250.00 for a full release of all claims against them by the Harbaughs based upon their alleged negligence. The trial judge found that the moneys paid under this release were based upon Harbaughs' claimed losses of rental income and personal property and damages to the sidewalk and north wall of the building.

## II Joint Tortfeasors

The appellant sets forth a two-prong attack on the trial court's verdict in favor of the appellees, based upon the Uniform Contribution Among Tort-Feasors Act, Md. Ann. Code (1957) art. 50, §§ 16-24 (The Act). Appellant begins with the assertion that the trial court was clearly erroneous in finding that RKO, Ditto and Huff were not joint tort-feasors. He then proceeds to argue, in the alternative, that:

A. The release of RKO and Ditto, by the appellee, also releases appellant, or;

B. Appellant should be credited, *pro-tanto,* for the amount paid by RKO and Ditto for their release.

The Act, § 16 (a) defines joint tortfeasors as: "[T]wo or more persons jointly or severally liable *in tort* for the *same injury* to person or property, whether or not judgment has been recovered against all or some of them." [1] (Emphasis

---

1. "The terms 'joint tort' and 'joint tortfeasors' have been surrounded by no little uncertainty and confusion. There have been various attempts to define them, and to propose tests of one kind or another as to when this may be found to exist. An examination of the multitude of cases in which they are to be found leads to the conclusion that they have meant very different things to different courts, and often to the same court, and that much of the existing confusion is due to a failure to distinguish the different senses in

supplied). Thus, reduced to a more basic concern, the issue becomes whether Huff's actions were "in tort" and whether they can be said to have resulted in the "same injury" to the Harbaughs as did the acts of RKO and Ditto.

The Act provides little guidance as to what the "same injury" would entail. Generally, when two parties have united to cause tortious harm to another the "same injury" to the individual is obvious, as for example when the negligence of the driver of one car and the negligence of the driver of a second car combine to injure a passenger. In such classic situation there can be no doubt as to the existence of the "same injury." The problem becomes more difficult in situations where, for example, an individual is injured as the result of the negligence of another and in subsequently receiving medical treatment the individual receives additional injuries. Can it be said that the original and subsequent tortfeasors are responsible for the "same" injuries so as to render them joint tortfeasors under § 16 of the Act? Logically, it would depend upon the nature of the injury sustained from each of the various tortfeasors, and thus would be a question of fact.

In the present case the appellant alleges that the "same injury" test is met because RKO, Ditto and the appellant were all sued in negligence based upon fire damage to the appellees' building. A closer look at the cause of action against the appellant reveals that its premise is not the fire damage to the building, but rather a breach of promise to secure fire insurance. Appellant's actions are related to RKO's only by the fact that were it not for the negligence of RKO and the resultant fire, the appellant's failure to procure the insurance would not have been brought to issue. Thus, it would be more accurate to categorize the injuries caused by appellant and RKO as "related" rather than the "same."

Additionally, it appears that the appellant's liability was not based on tort law, per se, but on the product of the union

which the terms are used, which often has had an unfortunate effect upon the substance of the law." Prosser, Torts p. 291 (4th Ed. 1977).

of tort and contract law. *Couch, Insurance 2d,* § 25:46 provides that:

"An agent or broker is liable to his principal if by his fault or neglect he fails to procure or renew insurance as he contracted to do, and as a result of the want of insurance the principal suffers a loss. *Such liability exists as one for breach of contract or as a tort in negligently failing to perform a duty imposed by contract.*" (emphasis added). (footnotes omitted).

The appellees initially brought suit alleging counts in both contract and tort. The trial judge combined the two theories and characterized the union as a "tortious breach of contract." In determining whether such category is to be viewed as being essentially tortious or contractual in nature for purposes of the applicability of the Act, the observation of this Court in *Bogley v. Middleton Tavern,* 42 Md. App. 314, 400 A.2d 15 (1979), *rev'd. on other grounds,* 288 Md. 645, 421 A.2d 571 (1980), is helpful. There it was stated:

"Appellant correctly recognized that where questions of contract and negligence causing a breach of that contract arise, the better analysis focuses on the contract question, i.e., whether an agency relationship existed, whether the principal was disclosed, partially disclosed or undisclosed in the questioned transaction, and what authority was vested in the agent. When these elements are addressed in the cause of action, the breach of contract commands our attention once the causal negligence of the agent is ascertained." *Id.* at 324.

*Cf., Canatella v. Davis,* 264 Md. 190, 286 A.2d 122 (1972) (contractual act negligently performed). *Compare Loh v. Safeway Stores, Inc.,* 47 Md. App. 110, 422 A.2d 16 (1980), where this Court dealt with the issue of whether a suit for breach of implied warranty could be a "claim in tort" for purposes of the Act. There it was concluded that "the warranty action, albeit a 'freak hybrid,' [of a cause of action

sounding in tort and contract] differs little in fact in products cases from 'causes of action sounding in tort.'" *Id.* at 121. Thus the warranty action was held to sound sufficiently in tort as to fall within the confines of the Act.

Despite the various views propounded as to whether an action containing elements of both tort and contract should be viewed as essentially tortious in nature or contractual, the determining factor is based on a factual predicate. The appellant had been asked to procure $30,000 worth of insurance protection for the appellees' building. He agreed to take care of the matter just as he had done on numerous other occasions. When the discussed policy, or other evidence of coverage failed to arrive through the mail, the appellees as well as representatives of the Hagerstown Trust Bank were assured by the appellant that the agreed coverage had been obtained. It had not. The trial judge concluded on the basis of all the evidence that "Bill Huff [appellant] is liable to Charles Harbaugh and sons [appellees] by breach of his agreement with Harbaugh to provide $30,000 insurance coverage against loss by fire by negligently failing to procure that insurance to protect his principal." We agree with this conclusion. The appellant was clearly negligent in the manner in which he behaved with respect to the agreement; however, the essential nature of his behavior remains the breach of contract with the appellees.

In summary, the setting forth of the § 16 definition of joint tortfeasors reveals an intent to require a closer relationship between wrongdoers with respect to cause of action and injury than exists in the present case.

### III Release

The appellant contends that the release procured by RKO and Ditto also serves to release all claims against the appellant. This contention is primarily based upon the alleged existence of a joint tortfeasor relationship between the parties. As previously discussed, this Court holds that such

relationship did not exist within the meaning of the Act.[2] The issue thus becomes whether the release of RKO and Ditto has any effect on the appellant outside the purview of the Act.

In discussing the history and treatment of releases in Maryland, the Court of Appeals stated the following in *Trieschman v. Eaton,* 224 Md. 111, 166 A.2d 892 (1961);

> "In the beginning independent wrongdoers liable for the same loss were not absolved by the release of one. Gradually the rule of release governing joint wrongdoers was extended to independent tortfeasors and it has become the law of most of the States. It was declared to be the law of this State in *Cox v. Maryland Elec. Rwys. Co.,* [126 Md. 300, 95 A. 43 (1915)]. The Court held that where one concurrent tortfeasor, who had been sued, paid an agreed amount in full to the injured person who caused to be made a docket entry in the case of 'agreed and settled and all claims therein satisfied,' there had been full satisfaction which discharged the other tortfeasor and barred a subsequent suit against him. The Court said that unlike the rule in some States, in Maryland 'it is not essential that the party with whom the settlement is made or by whom the release is given shall be a joint *tort feasor* in order to release others from liability." *Id.* at 117.

*See also, Cox v. Maryland Elec. Rwys. Co.,* 126 Md. 300, 95 A. 43 (1915); *Grantham v. Prince George's County,* 251 Md.

---

2. Even were we to hold that a joint tortfeasor relationship existed under these facts, the release of RKO and Ditto would not per se release Huff in light of § 19 of the Act which provides:

"A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides; but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid."

28, 246 A.2d 548 (1967); and *Pemrock, Inc. v. Essco Co., Inc.,* 252 Md. 374, 249 A.2d 711 (1969).

The common thread weaving its way throughout each of these cases is that there can be but one recovery for a single wrong. Such is the principle we will adhere to in rendering this opinion. Expounding upon this basic premise the Court of Appeals commented in *Cox v. Maryland Elec. Rwys. Co., supra:*

"If the [two defendants] had both been sued in the first case for the injury there alleged, there could, of course, have been but one recovery. And it would seem to be very clear, upon reason and authorities as well, that the same result must follow when the same injury is caused by the independent acts of several wrongdoers. The reason of this rule is apparent. It is neither just nor lawful that there should be more than one satisfaction for the same injury, whether that injury be done by one or more. . . ." *Id.* at 305-06.

Taking this premise to the next logical step, it would appear that where it can be established that there is more than one wrong at issue, involving independent parties, the release of one wrongful party would not serve to release any other. Such was demonstrated in the case of *Kyte v. McMillion,* 256 Md. 85, 259 A.2d 532 (1969). In *Kyte,* the plaintiff was injured as a result of the acts of two successive tortfeasors, each act causing a separate and distinct harm: first, the plaintiff was injured while a passenger in a negligently driven automobile, and second, the plaintiff experienced new and separate injuries as the result of the negligence of the hospital nurse who transfused plaintiff with mismatched blood. The Court held that the subsequent release of the hospital nurse, specifically limited to the injury resulting from the negligent transfusion, did not preclude the plaintiff from asserting a claim against the driver for injuries stemming from the automobile accident. In rendering this decision the Court reiterated the principle that "there can be but one satisfaction for the same injury." However, it was

held that because the plaintiff had sustained two injuries of which only one had been satisfied, she was not precluded from initiating suit against the other party. Emphasis was placed on the "wholly divisible" nature of the injuries incurred.

In accord with the foregoing principles we hold that where a wrong consists of separate and distinct, although closely related, injuries for which the parties are respectively liable, then the release of one with respect to his wrongdoing will not discharge the other from liability for his share in the transaction.

In view of this holding we need not address the issue of the effect of the express reservation within the release upon the liability of Huff.

## IV Contributory Negligence

Appellant contends that the appellees were contributorily negligent in that, based on the appellees' experience with respect to commercial real estate, they should have known that the building at issue was not covered by insurance when a policy or binder had not been received for a period of twelve months.

Prosser, *Torts,* p. 416-17 (4th ed. 1977) defines contributory negligence as follows:

> "Contributory negligence is conduct on the part of the plaintiff, contributing as a legal cause to the harm he has suffered, which falls below the standard to which he is required to conform for his own protection. Unlike assumption of risk, the defense does not rest upon the idea that the defendant is relieved of any duty toward the plaintiff. Rather, although the defendant has violated his duty, has been negligent, and would otherwise be liable, the plaintiff is denied recovery because his own conduct disentitles him to maintain the action." (footnote omitted).

*See also, Hooper v. Mougin,* 263 Md. 630, 284 A.2d 236 (1971).

We agree with the trial court's finding of an absence of contributory negligence on the part of the appellees. Charles Harbaugh, one of the appellees, had known and been friends with the appellant, Huff, for a period of 35 years. When appellant became an insurance agent, Harbaugh transferred all of his insurance business to him. In the twenty years in which Huff acted as insurance agent for Harbaugh, at no time did he fail to produce the requested insurance. In view of this extensive history of satisfactory dealings between the parties and the continuing misrepresentations to both Harbaugh and the bank, it cannot be said that Harbaugh should have been aware that the requested insurance did not exist.

## V Statute of Limitations

The appellant contends that the appellees are barred from maintaining their suit in that it was not brought within three years of the time in which he should have discovered his building did not have fire insurance. The trial court disagreed stating:

> "Since Mr. Huff continually maintained that he 'would get the coverage' and it was not until after the fire on February 8, 1974 when it was discovered that he had not, the plaintiff was kept in ignorance of any cause of action through the statements of the defendant. The cause of action did not accrue until Harbaugh first had knowledge that Mr. Huff had failed to perform his duty — February 8, 1974. Since this suit was brought on February 4, 1977 the statute had not run."

We perceive no error in this holding. *Poffenberger v. Risser,* 290 Md. 631, 431 A.2d 677 (1981).

## VI Damages

Finally, the appellant asserts that he should be credited *pro tanto* for the amount paid by RKO and Ditto to secure their release. As previously discussed, the Maryland cases have adhered to the principle that "there can be but one satisfaction for the same injury." Thus, in analyzing the validity of the award of damages in the present case we must determine whether the appellees are being compensated twice for the same injury.

It has already been established that the appellees suffered two distinct injuries: one from the appellant in his breach of contract and another from RKO and Ditto in their imposition of physical damage to the appellees' premises. What must be evidenced under the one injury-one satisfaction rule is that each of these distinct injuries has been monetarily compensated for in a manner involving no duplication.

The standard for computation of damages has been recognized by this Court in *Patterson Agency, Inc. v. Turner,* 35 Md. App. 651, 372 A.2d 258 (1977), where it was stated:

> "When, as here, the agent or broker fails to procure the insurance, and an intervening casualty occurs before the agent or broker can notify his principal of non-availability so that insurance might be obtained from another, the agent or broker is liable to the insured, his estate, or those claiming under him in the amount that would have been due under the policy had it been obtained." *Id.* at 657.

*See also, Lowitt v. Pearsall Chemical,* 242 Md. 245, 219 A.2d 67 (1966).

The appellees had requested appellant to procure $30,000 worth of insurance for the building on South Potomac Street. In July 1973 the appellant applied to Nationwide for "$30,000 or Coverage A: Building or Structure" against loss by fire. Testimony at trial revealed that under the standard fire insurance policy the insurer would agree to pay the actual

cash value of the loss and the expense of debris removal as long as the two elements did not exceed the face value of the policy. "Actual cash value" was defined as replacement cost minus a depreciation factor, with such determination being made by an adjustor. The trial judge noted that no evidence was introduced by the appellant with respect to what depreciation factor would have been employed in the adjustment of this loss had a policy been issued. The court opined that the burden of producing such evidence should not be upon the appellees as they had brought forth evidence as to both replacement cost, i.e., $60,000, and fair market value, i.e., $37,000 — $40,000. Once the appellees had established that both the replacement cost and the fair market value of the building exceeded the amount of the desired coverage the trial court found that the burden of proof shifted to the appellant to show that had a policy been issued, the insurer would have paid an amount less than the face value of $30,000. We agree.

This Court is also satisfied that there is no double recovery by the appellees. The amount received with respect to the release of claims against RKO and Ditto have been demonstrated to be compensation for the loss of rental income and personal property damages, i.e., items outside the purview of the proposed fire insurance coverage. The only aspects of the compensation which fall within potential policy coverage are the cost of the debris removal, $2,200, and the cost of reparation of the north wall, $2,250. As the trial judge offset the amount to be received by appellees by the sum of these two figures, namely, $4,450, we believe the final verdict of $25,550 fairly and adequately compensated the appellees without giving them the windfall of a double recovery.

### VII Assumption of Risk and Right of Subrogation

The appellant additionally asserts the defense of assumption of risk on the part of the appellees and claims a right of subrogation. As these claims were not offered at the

trial below, they have not been preserved for review. Md. Rule 1085.

*Judgment affirmed.*
*Appellant to pay the costs.*