Daniel C. MORLEY; William T. Evans, Plaintiffs–Appellees,

v.

Irving COHEN; Halajen Mineral Development Corporation, Defendants–Appellants,

and

Mountainview Associates; Newport Coal Associates etc., et al., Defendants.

Daniel C. MORLEY; William T. Evans, Plaintiffs–Appellees,

v.

Irving COHEN; Halajen Mineral Development Corporation, Defendants–Appellants.

Nos. 88–1391, 89–2303.

United States Court of Appeals, Fourth Circuit.

Argued Sept. 12, 1989.

Decided Oct. 30, 1989.

See also, D.C., 610 F.Supp. 798.

**1008**

Peter A. Jaffe (Carol A. Jablonski, Lawrence M. Nessenson, Jaffe and Asher, on brief) for defendants-appellants.

Richard Douglas Bennett (Donna M. Larkin, Weaver, Bendos & Bennett, on brief) for plaintiffs-appellees.

Before MURNAGHAN, SPROUSE and CHAPMAN, Circuit Judges.

SPROUSE, Circuit Judge:

The controversy underlying this appeal involved a tax shelter investment in coal mines which the appellees contend was a scheme to defraud investors, but which the appellants assert was simply a risky investment that went awry.

Irving Cohen and the Halajen Development Corporation appeal a district court judgment awarding Daniel Morley and William Evans[1] $265,940 trebled after a jury found for them on RICO[2] and state law claims. Cohen raises a plethora of issues on appeal, including the sufficiency of the evidence, the admission of certain evidence, and the court's subsequent award of $258,162 in attorneys' fees. On these matters, we affirm the decision of the court below. However, we reverse the district court's refusal to reduce the judgment by the amount of a codefendant's settlement.

### Facts

In 1976 Morley and Evans requested a partner with the brokerage firm of Baker, Watts & Company to recommend investments with tax shelter opportunities. The partner advised them about Mountainview Associates, a limited partnership formed to lease and mine Kentucky coal. Mountainview's general partner was Halajen, a subchapter S corporation of which Cohen was the sole shareholder.

The Mountainview Confidential Descriptive Memorandum (CDM) misrepresented the role of an engineering company in the operation. It did not disclose that a convicted securities felon, Alexander Guterma, was actively involved in the company hired to mine the Mountainview coal. Nor did it mention that Mountainview's accountant, Marvin Rosenbaum, had just pled guilty to securities fraud.[3] Morley also contended that the CDM misrepresented Mountainview's compliance with IRS regulations to receive favorable tax treatment. (Cohen later sent an Addendum explaining tax law changes but indicating the investments should receive favorable tax treatment.) The CDM did disclose, however, that Cohen would receive an organizational fee of $300,000 and a management fee of $150,000.

In October 1976, Morley invested $50,000 in Mountainview; Evans invested $100,000. During that same period, Cohen-controlled corporations withdrew nearly two million dollars from six coal entities, including Mountainview. When, in mid-to-late 1977, Cohen sent a letter to the investors explaining that one of his advisors had a prior conviction for violating securities laws and offering them an opportunity to rescind their investments, they did not act. Instead, having received income distributions from the Mountainview venture, Morley and Evans invested $40,000 and $80,000 respectively in another Halajen project, Newport Coal Associates. By that time, Cohen was himself the target of an SEC investigation. He did not inform his investors about the probe, either through correspondence or at a face-to-face meeting in November 1977.

That same month, the *Wall Street Journal* carried a story concerning Guterma's death in a plane crash. The article characterized him as a financial manipulator and securities felon whose wife's estate was involved in a dispute with Cohen over coal

---

1. Hereinafter, Cohen shall refer to Cohen and Halajen; Morley shall refer to Morley and Evans. Evans died in November 1988, and his wife Karen Evans was named executrix of his estate.

2. Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68.

3. Cohen later claimed he was unaware of the man's legal problems, and could not recall why he made a $10,000 payment to Rosenbaum during this period.

assets. A lawyer testified that he sent the article to Morley and Evans in 1978, but they testified they never received it. Cohen referred to the article in a letter to them that year.

In correspondence with the investors, Cohen wrote of problems with coal prices, miners, permits, and equipment. He also indicated that the death of Guterma impeded Mountainview mining. However, the letters offered assurances of the continuing vitality of the mines, in spite of such setbacks. Meanwhile, mining operations waned at Mountainview; they were never begun at Newport Coal.

It was not until February 1981 that Cohen sent Morley a letter concerning an SEC investigation and settlement relating to Mountainview. Morley said that letter alerted the investors to the "con," and triggered their own probe.

In December 1983 Morley filed a complaint in the district court against Cohen and his coal entities; it was amended to add the Baker, Watts brokerage.[4] Baker, Watts settled prior to trial for $225,000. The court refused Cohen's request for a separate trial on statute of limitations issues, but granted his motion to quash Morley's subpoena requiring him to appear at trial. Midway through the trial in July 1988, Cohen asked the court to limit cross-examination so that he would be able to appear without the risk of asserting his fifth amendment privilege against self-incrimination. The district court denied this motion, and the trial continued without the presence of Cohen.

The jury returned a verdict against Cohen, awarding Morley $265,940 for RICO violations, and $514,122.98 for common law fraud, breach of contract, conversion, and breach of fiduciary duty. The trial judge ruled these damages duplicative and entered judgment of $265,940 trebled on the RICO count only. He also denied Cohen's motion for judgment notwithstanding the verdict. In December 1988 the judge granted Morley's motion for attorneys' fees and ordered Cohen to pay $258,162. Cohen appealed.

### Sufficiency of the Evidence on the RICO Claim

Despite Cohen's contentions to the contrary, we find the evidence sufficient to support the judgment on the RICO count. To establish a civil RICO case, the plaintiff must prove "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted). Racketeering activity includes the predicate acts of mail and wire fraud, the offenses at issue in the present case. *See* 18 U.S.C. §§ 1961(1), 1341, 1343. To succeed in an action, the plaintiff must prove that he was "injured in his business or property." *Id.* at § 1964(c). Cohen argues that Morley failed to prove three of these requirements: predicate acts, pattern, and consequent economic injury. We address his contentions relating to each.

### Predicate Acts

The offenses of mail and wire fraud require use of the mails or wires coupled with an intent to defraud. *See* 18 U.S.C. §§ 1341, 1343. Cohen argues that both elements are absent from the proof Morley presented to the jury.

He stresses that the mail and wire communications between Cohen and Morley took place after Morley's investments in Cohen's coal projects. This argument, however, can give him no comfort. It is settled that the statutes encompass use of the mails or wires after the initial financial transaction when such use is "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States v. Maze,* 414 U.S. 395, 403, 94 S.Ct. 645, 650, 38 L.Ed.2d 603 (1974). The key is

---

**4.** Several partners in the brokerage were named in the complaint. The brokerage and partners are referred to as Baker, Watts throughout this opinion.

The complaint also included the lawyers and accountant who had assisted in preparing the offering for the coal mine investment. They were dismissed for lack of personal jurisdiction.

whether the communication occurred "for the purpose of executing the scheme." *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). *Compare United States v. Lane,* 474 U.S. 438, 451–53 & n. 16, 106 S.Ct. 725, 733–34 & n. 16, 88 L.Ed.2d 814 (1986); *United States v. Sampson,* 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); *and United States v. Snowden,* 770 F.2d 393, 398 (4th Cir.), *cert. denied,* 474 U.S. 1011, 106 S.Ct. 540, 88 L.Ed.2d 470 (1985), *with Maze,* 414 U.S. at 403, 94 S.Ct. at 650; *Kann,* 323 U.S. at 94–95, 65 S.Ct. at 150–51; *and United States v. Taylor,* 789 F.2d 618 (8th Cir. 1986).

■ Here, Morley received through the mails distributions from the Mountainview project in the months preceding his Newport Coal investment. Numerous letters from Cohen to Morley were presented at trial. They contained assurances concerning the status of Morley's investments, although the letters referred to specific problems regarding Mountainview and Newport Coal. There was also evidence of a telephone conversation between Cohen and Morley regarding the mining operations. We believe that a jury could have weighed this evidence and reasonably concluded that the effect of these communications was to lull Morley into leaving investments in Cohen's control,[5] and that they were therefore part of Cohen's "ongoing scheme to defraud," rather than an incidental development after the scheme had reached fruition. *Lane,* 474 U.S. at 452 n. 16, 106 S.Ct. at 734 n. 16.

■ Cohen also urges that the evidence fails to support a finding of intent to defraud. He and Morley each point to specific evidence buttressing their positions. Viewing it all, we believe that the evidence was sufficient to support a jury finding that Cohen acted with intent to defraud.[6]

We therefore conclude that the district court did not err in refusing to grant a judgment notwithstanding the verdict due to insufficient proof of the predicate acts for Morley's RICO claim.

*Pattern*

■ Cohen also argues that Morley proved at most a single scheme, and not a "pattern of racketeering activity." But the Supreme Court put that argument to rest in *H.J. Inc. v. Northwestern Bell Telephone Co.,* 429 U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). The Court explained that two elements—relationship and continuity—must be present to establish a pattern. In analyzing the continuity component, the Court said:

> [A]lthough proof that a RICO defendant has been involved in multiple criminal schemes would certainly be highly relevant to the inquiry into the continuity of the defendant's racketeering activity, it is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes.... What a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter.* ...
>
> ... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time.

*Id.* 109 S.Ct. at 2901–02. We think the duration of the activities in question (from Morley's initial investment in 1976 to his receipt of Cohen's letter in 1981 advising him of Cohen's settlement with the SEC pursuant to its Mountainview investigation) is sufficient to meet this continuity requirement.

Regarding the relationship component of the pattern inquiry, the Court stated:

> "[C]riminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commis-

---

5. Cohen argues that Morley slept on his rights and filed this action outside the bounds of the statute of limitations. But Morley argues that the period between his investment and the filing of this action is evidence of the lulling effect of Cohen's letters. We agree with Morley.

6. Indeed, the verdict against Cohen on the pendent common law fraud claim is consistent with the RICO verdict.

sion, or otherwise are interrelated by distinguishing characteristics and are not isolated events."

*Id.* at 2896 (quoting 18 U.S.C. § 3575(e)). We conclude the evidence of predicate acts introduced by Morley supports the finding of relationship required by *H.J. Inc.*

## Economic Injury

■ Cohen next urges that Morley has not established the requisite causal nexus between the predicate acts of mail and wire fraud, and injury to Morley's economic interest. In *Brandenburg v. Seidel*, 859 F.2d 1179 (4th Cir.1988), we explained:

> [W]hile ... it is not necessary to establish detrimental reliance by the victim in order to make out a violation of the federal mail fraud statute, such reliance is necessary to establish injury to business or property "by reason of" a predicate act of mail fraud within the meaning of § 1964(c).

*Id.* at 1188 n. 10 (citation omitted). In the present case, Morley made it clear that he would not have invested in either Mountainview or Newport Coal if he had known about Cohen's misrepresentations and concealments. He also indicated that his reliance on Cohen's letters prevented him from launching an earlier investigation into the coal investments. Although Cohen points to Morley's testimony that he could not remember reading portions of the Mountainview memorandum, we believe sufficient evidence was introduced to present a jury question on this issue.

In short, we conclude that Morley presented sufficient evidence to support a jury verdict on the civil RICO claim, and the district court judge properly acted within his discretion in denying Cohen's motion for judgment notwithstanding the verdict on this basis.

Cohen also contends that the evidence presented at trial was insufficient to support the pendent common law claims. Because judgment was not entered on these claims by the court below, and because of our conclusion here, we need not address this argument.

## Evidentiary Rulings

■ Cohen argues that evidentiary rulings by the district court created a prejudicially unfair atmosphere. Cohen takes issue with the introduction of evidence concerning (1) his finances and business dealings, (2) the transfer of funds from Halajen to other entities, (3) the SEC investigation, and (4) the IRS revenue reports. He objects to (5) the testimony of unhappy investors in a Cohen book project. He complains of (6) being prevented from properly examining a witness. He protests (7) the use of a chart by Morley's counsel to summarize Cohen's corporate affiliations and (8) the remarks made by Morley's counsel during closing argument. Cohen suggests the net effect of these rulings was to put his lifestyle and character on trial, in violation of Fed.R.Evid. 403 and 404.

Morley counters that the evidence in question was highly probative on the question of intent, a critical element of his RICO and common law fraud claims, and therefore was properly admitted under Fed.R.Evid. 403 and 404(b).

In *Estate of Larkins v. Farrell Lines, Inc.*, 806 F.2d 510 (4th Cir.1986), *cert. denied*, 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987), we observed:

> The trial judge enjoys broad discretion in balancing the relevance of evidence against its possible unfair prejudice under Fed.R.Evid. 403. The Rule 403 balance is essentially a matter of trial conduct; "if judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal."

*Id.* at 515 (quoting *United States v. Long*, 574 F.2d 761, 767 (3d Cir.), *cert. denied*, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978)). On the facts of the present case, we find no abuse of discretion in the admission of this evidence and decline to second-guess the judgment of the trial court.

■ Cohen also argues that the trial court improperly denied his motion *in limine* to restrict the scope of cross-examination if he should take the stand. We think the district court properly declined this ruling. It is worth recalling that, be-

fore trial, the court had granted Cohen's motion to quash Morley's subpoena requiring him to appear. Mid-trial, Cohen apparently changed his mind—but only if he would not be required to face questions concerning a pending criminal investigation of a book investment plan, which might lead him to assert his fifth amendment right. The Supreme Court, in *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976), reiterated:

> [T]he prevailing rule [is] that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them: the Amendment "does not preclude the inference where the privilege is claimed by a *party to a civil cause.*"

*Id.* at 318, 96 S.Ct. at 1558 (quoting 8 J. Wigmore, Evidence 439 (McNaughton rev. 1961)). So here, the district court did not abuse its discretion in refusing to shield Cohen from facing the alternative of testifying or invoking the fifth amendment in the presence of the jury.

### *Judgment Reduction*

We conclude, however, that the district court erred in declining to reduce the judgment by the amount of Morley's settlement with the Baker, Watts brokerage. Morley had executed a joint tort-feasor release in connection with the $225,000 settlement. Absent the treble damage factor, adding the base $265,940 judgment entered by the district court to the amount he received in settlement would have the effect of allowing Morley almost a two-fold recovery. The district court concluded, and Morley urges, that this result is mandated under Maryland's Joint Tort–Feasors Statute, Md. Ann.Code of 1957 art. 50, §§ 16–24. We disagree.

Morley focuses his argument on the statutory definition of joint tort-feasors as "two or more persons jointly or severally liable in tort *for the same injury....*" *Id.* at § 16(a) (emphasis added). He contends that the harms created by Cohen extend beyond those for which the brokerage was responsible, and are therefore distinct for purposes of this statute. Morley points to *Huff v. Harbaugh*, 49 Md.App. 661, 435 A.2d 108 (1981), to support this analysis, but *Huff* is distinguishable. There, a building which was improperly insured caught fire. A structure next door was also damaged by the flames. The first building sustained additional damage when the second structure was demolished. The owner of the first building sued his insurance agent and the parties involved in the demolition incident. The *Huff* court concluded two distinct wrongs were present. The court also discussed the difficulties involved in interpreting the joint tort-feasor act, and provided an analogy that is particularly apt in the present case:

> Generally, when two parties have united to cause tortious harm to another[,] the "same injury" to the individual is obvious, as for example when the negligence of the driver of one car and the negligence of the driver of the second car combine to injure a passenger. In such [a] classic situation there can be no doubt as to the existence of the same "injury."

*Id.* at 666, 435 A.2d at 111. The *Huff* court, reviewing the decisions of the Maryland Court of Appeals, concluded: "The common thread weaving its way throughout each of these cases is that there can be but one recovery for a single wrong." *Id.* at 670, 435 A.2d at 113.[7]

■ Morley points out that judgment was entered under the RICO claim, in which Baker, Watts was not a defendant. That is not sufficient to establish the distinct wrongs necessary for Morley to es-

**7.** The same theme emerges from *University Nursing Home v. R.B. Brown & Assoc.*, 67 Md. App. 48, 506 A.2d 268, *cert. denied*, 306 Md. 514, 510 A.2d 260 (1986), another fire insurance case. There, the plaintiff settled with the insurance company for the insurance policy as written, but was allowed to proceed against the insurance agent for the amount of insurance that should have been provided. The court said, "This result follows the policy of court decisions holding that while an individual should not be permitted to recover more than the actual damages, an injured individual should be able to collect one full satisfaction." *Id.* at 67, 506 A.2d at 277.

cape a reduction in damages. The jury returned a verdict on the pendent state law claims in which Baker, Watts was a named defendant, as well as on the RICO count. Judgment was entered only on the RICO claim precisely to avoid duplicative damages, ironically the problem we deal with today.

■ We conclude that the single satisfaction rule and the Maryland Joint–Tortfeasors Act require a reduction in the damage award in the present case. Such reductions have previously been adopted in RICO actions. *See, e.g., In re Nat'l Mortgage Equity Corp. Mortgage Pool,* 636 F.Supp. 1138, 1151–52 (C.D.Cal.1986); *Pennsylvania v. Cianfrani,* 600 F.Supp. 1364, 1368 (E.D.Pa.1985). The deduction here should be made after trebling. *Mortgage Equity,* 636 F.Supp. at 1151–52; *Cianfrani,* 600 F.Supp. at 1368; *see also Burlington Indus. v. Milliken & Co.,* 690 F.2d 380, 391 (4th Cir.1982), *cert. denied,* 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983) (settlement deductions made after trebling in antitrust cases). We remand to the district court for modification of the damage award consistent with these instructions.

### *Attorneys' Fees*

■ Cohen next contends that the district court erred in awarding Morley attorneys' fees. He argues that attorneys' fees are an integral part of the judgment, rather than a collateral issue, in a RICO action. *See* 18 U.S.C. § 1964(c). Because fees were not addressed in the district court's order of judgment, Cohen says Morley should have filed a motion to alter or amend the judgment within ten days, as required under Fed.R.Civ.P. 59(e). Instead, Morley filed his motion within the twenty-day time limit prescribed by the Maryland district court's Local Rule 23A for attorneys' fee petitions. Cohen says this distinction should cost Morley the $258,162 award made by the district court. We disagree.

The Eleventh Circuit has held that requests for attorneys' fees in RICO cases are not governed by Rule 59(e). *Gordon v. Heimann,* 715 F.2d 531, 537 (11th Cir. 1983). The *Gordon* court based its analysis on *White v. New Hampshire Dep't of Employment Sec.,* 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982), which held that Fed.R.Civ.P. 59(e) did not apply to requests for attorneys' fees under 42 U.S.C. § 1988. The *White* court explained that Rule 59(e) was generally invoked

> only to support reconsideration of matters properly encompassed in a decision on the merits. By contrast, a request for attorney's fees under § 1988 raises legal issues collateral to the main cause of action—issues to which Rule 59(e) was never intended to apply.

*Id.* at 451, 102 S.Ct. at 1166 (citation & footnote omitted). The *Gordon* court declared, "[T]he Supreme Court's emphasis in *White v. New Hampshire* of the limited role of Fed.R.Civ.P. 59(e) suggests that attorneys' fees requests should never be governed by that time limitation." *Gordon,* 715 F.2d at 538.

This circuit has applied the *White* approach outside the context of 42 U.S.C. § 1988. In *Hicks v. Southern Maryland Health Systems Agency,* 805 F.2d 1165 (4th Cir.1986), we concluded that the *White* "reasoning applies as well to awards under Rule 11 and the other statutes." *Id.* at 1166. In a case concerning the award of attorneys' fees in ERISA litigation, the Seventh Circuit has stated, "The Rule 59(e) route would trap the unwary in some cases and in others cause half-baked fee requests to be submitted that would have to be amended later." *Bittner v. Sadoff & Rudoy Indus.,* 728 F.2d 820, 828 (7th Cir. 1984).

Cohen cites decisions of the Third and Fifth Circuits which suggest a contrary result. *See Beckwith Mach. Co. v. Traveler's Indemnity Co.,* 815 F.2d 286 (3d Cir. 1987); *Bilmar Drilling, Inc. v. IFG Leasing Co.,* 795 F.2d 1194 (5th Cir.1986); *Alcorn County v. U.S. Interstate Supplies, Inc.,* 731 F.2d 1160 (5th Cir.1984). These cases concerned the impact of a motion for attorneys' fees on the finality of a judgment, and turned on a distinction between awards of fees that are integral to the

action, and those which are collateral. The Supreme Court in another case, however, has rejected the integral/collateral distinction for finality determinations, and stated, "As a general matter, at least, we think it indisputable that a claim for attorney's fees is not part of the merits of the action to which the fees pertain." *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 108 S.Ct. 1717, 1721, 100 L.Ed.2d 178 (1988). This perspective on attorneys' fees was reiterated last term in *Osterneck v. Ernst & Whinney*, 489 U.S. ——, 109 S.Ct. 987, 990–91, 103 L.Ed.2d 146 (1989).[8] Both *Budinich* and *Osterneck* were unanimous decisions; both cited *White* extensively; and both interpreted *White* expansively.

In light of these Supreme Court decisions, the Eleventh Circuit's persuasive analysis in *Gordon,* and our own rationale expressed in *Hicks,* we conclude that Morley's request for attorneys' fees was timely filed. We also conclude that the district court did not abuse its discretion in denying Cohen a hearing on the issue of attorneys' fees. *Environmental Defense Fund v. Lamphier,* 714 F.2d 331, 340 (4th Cir.1983); *National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1330 (D.C.Cir.1982).

Cohen raises a host of other issues. He argues that the weight of the evidence favored him on his affirmative defenses;[9] and that the district court erred in refusing to grant a separate trial on statute of limitations issues, and in refusing to give requested jury instructions. We find these arguments to be without merit.

### Conclusion

To recapitulate, we find that the district court erred in declining to reduce Morley's recovery by the amount received in settlement from Baker, Watts. We affirm on all other grounds.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.

---

**8.** *Osterneck* held that Rule 59(e) applied to a postjudgment motion for discretionary prejudgment interest, explaining, "[U]nlike attorney's fees, which at common law were regarded as an element of costs and therefore not part of the merits judgment, prejudgment interest traditionally has been considered part of the compensa-

tion due plaintiff." *Osterneck,* 109 S.Ct. at 991 (citing *Budinich,* 108 S.Ct. at 1717).

**9.** He lists these as the statute of limitations, waiver and estoppel, contributory or comparative negligence, set-off, and intervening cause.