# PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

GE INVESTMENT PRIVATE PLACEMENT
PARTNERS II, a limited partnership;
ARDHOUSE, LLC,
            *Plaintiffs-Appellants,*

            v.

TEDDY DALE PARKER; MLP
INVESTMENTS, INCORPORATED; ROBERT
W. STOUT; HENRY G. LEWIS, JR.;
DURHAM LEWIS,
            *Defendants-Appellees.*

No. 00-2240

Appeal from the United States District Court
for the Eastern District of North Carolina, at Wilmington.
W. Earl Britt, Senior District Judge.
(CA-99-215-7-BR)

Argued: March 1, 2001

Decided: April 18, 2001

Before WIDENER and MICHAEL, Circuit Judges,
and Cynthia Holcomb HALL, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

Affirmed by published opinion. Senior Judge Hall wrote the opinion,
in which Judge Widener and Judge Michael joined.

## COUNSEL

**ARGUED:** Seth C. Farber, DEWEY BALLANTINE, L.L.P., New
York, New York, for Appellants. Eric Phillip Stevens, POYNER &

SPRUILL, L.L.P., Raleigh, North Carolina, for Appellees. **ON BRIEF:** Pressly M. Millen, Sean E. Andrussier, WOMBLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Raleigh, North Carolina, for Appellants. David Dreifus, Jeffrey B. Welty, POYNER & SPRUILL, L.L.P., Raleigh, North Carolina; Andrew O. Whiteman, HARTZELL & WHITEMAN, L.L.P., Raleigh, North Carolina; Catharine B. Arrowood, R. Bruce Thompson, II, PARKER, POE, ADAMS & BERNSTEIN, L.L.P., Raleigh, North Carolina, for Appellees.

---

### OPINION

HALL, Senior Circuit Judge:

In this appeal, we address the requirement that the plaintiffs prove a "pattern of racketeering activity" under the RICO statute. Plaintiffs GE Investment Private Placement Partners II ("GE Investment") and Ardhouse, LLC, sued Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), violation of the federal securities laws, 15 U.S.C. § 78aa, and several state law claims for fraud, negligent representation, and unfair business practices. Defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The district court referred the motion to a magistrate judge for a report and recommendation, which the district court subsequently adopted. The district court dismissed Plaintiffs' RICO claims for failure to allege a "pattern of racketeering activity," dismissed the federal securities claim, and denied Plaintiffs leave to amend their complaint. The district court dismissed without prejudice the pendent state law claims.

Plaintiffs appeal only the dismissal of their RICO claims. We affirm the judgment of the district court.

### I.

Because the complaint was dismissed pursuant to Rule 12(b)(6), we assume the facts alleged in the complaint are true. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). Plaintiffs allege as follows:

Defendant Ted Parker ("Parker") founded and was the CEO and sole shareholder of Ted Parker Home Sales ("TPHS"), a retail manufactured housing company that operated in North Carolina, South Carolina, and Mississippi. The remaining defendants all held various positions within TPHS. Plaintiffs Ardhouse and GE Investment were investors in TPHS.

Defendants engaged in a variety of fraudulent practices that allowed Parker to siphon off cash from the company and inflate TPHS's value. TPHS purchased its mobile homes directly from manufacturers, and each purchase was fully financed by a "floor plan lender." The floor plan lender remitted the full invoice price directly to the manufacturer in exchange for a security interest in the home, periodic interest payments, and a promise by TPHS to repay the purchase price when the house was sold. TPHS, however, had secret arrangements with the manufacturers whereby the manufacturers gave TPHS cash rebates and kickbacks but did not lower their invoice prices to cover the rebates. Because it obtained financing through floor plan lenders, TPHS did not need to have cash up front to purchase new homes. Because the manufacturers gave TPHS the cash rebates immediately, TPHS thus was able to increase its cash on hand by purchasing inventory. TPHS recorded the rebates and kickbacks as income upon receipt, but did not offset its liability to the floor plan lenders, thereby creating a false impression of profitability. Parker also siphoned off cash from TPHS through affiliated businesses and through self-dealing.

To keep sales going, TPHS instructed its sales personnel to engage in the practice of "short down payments." According to this practice, TPHS would issue checks to customers for worthless trade-in homes. The customers would cash the checks from TPHS and use the cash to obtain a bank check. The customers then would give the bank check to TPHS as a phony cash down payment, which would allow the customer to qualify for a mortgage. Ultimately, however, sales could not keep pace with the purchase of homes from the manufacturers, and the company would not be able to sustain itself under the burden of massive loans by floor plan lenders.

In spring of 1998, Parker decided to sell a majority of his investment in TPHS and hired Geneva Corporate Finance, Inc. ("Geneva")

to find potential buyers. Defendants provided Geneva with false financial information to include in an Offering Memorandum, which Geneva circulated on Parker's behalf. Ardshiel, Inc., an investment firm that locates investments for Plaintiffs, received a copy of the Memorandum in April 1998. In reliance on the Memorandum and its false information, Ardshiel concluded that TPHS was a promising investment and began negotiating for the acquisition of an interest in TPHS by Plaintiffs.

During the negotiations, Defendants provided false information concerning TPHS's average and projected sales. Defendants successfully concealed their fraudulent revenue recognition practices and the nature of the inflated rebates received by TPHS from home manufacturers. On December 14, 1998, Plaintiffs executed agreements whereby they acquired ownership of a substantial interest in TPHS. Through a series of holding companies, Plaintiffs acquired 60% of the common stock of TPHS and a $3 million note. In return, Parker, through a holding company, received $32 million in cash plus notes with a potential value of $69 million, $7 million in preferred stock, and $5 million in TPHS assets. TPHS itself received $10 million in cash. Some of the defendants received new employment contracts that included stock options in TPHS. After the closing, TPHS paid Defendants substantial bonuses.

After the closing, Defendants remained involved in TPHS's operations and continued to conceal TPHS's declining financial condition. As a result, in summer 1999, Plaintiffs loaned $5,655,000 to TPHS and related companies to help TPHS through what Plaintiffs believed were temporary liquidity problems. Defendants hoped to conceal their fraud long enough to conduct an initial public offering. TPHS and the holding companies were unable to stay afloat, however, and filed for bankruptcy protection in June and July of 1999. In September 1999, TPHS liquidated most of its assets for $1.2 million and the assumption of various liabilities.

On November 12, 1999, GE Investment and Ardhouse filed the instant suit against Defendants in federal district court.[1] They filed

---

[1]Ted Parker and the other defendants in this case had previously filed a related suit against GE Investment and Ardhouse in a North Carolina state court on August 23, 1999. That case is ongoing.

their First Amended Complaint on December 22, 1999. On August 22, 2000, the district court granted Defendants' motion to dismiss under Rule 12(b)(6) and denied Plaintiffs leave to amend their complaint.

## II.   STANDARDS OF REVIEW

This court reviews the dismissal of claims pursuant to Rule 12(b)(6) *de novo*. *Mylan Labs.*, 7 F.3d at 1134. On a Rule 12(b)(6) motion to dismiss, a court must accept the factual allegations of the complaint as true and must view the complaint in the light most favorable to the plaintiff. *Id.* The court should not affirm a motion to dismiss for failure to state a claim for relief unless "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

We review the district court's denial of leave to amend the complaint for an abuse of discretion. *HCMF Corp. v. Allen*, 238 F.3d 273, 276-77 (4th Cir. 2001). Leave to amend may properly be denied where amendment would be futile. *Id.* at 276.

## III.   DISCUSSION

The RICO statute creates civil liability for those who engage in a "pattern of racketeering activity." 18 U.S.C. §§ 1962, 1964. The statute defines racketeering activity to include, among other acts, acts of mail and wire fraud. 18 U.S.C. § 1961(1). The district court struck several of Plaintiffs' allegations of predicate acts of mail and wire fraud for failure to satisfy the specificity requirement of Federal Rule of Civil Procedure 9(b). The district court then denied Plaintiffs leave to amend their complaint on the ground that amendment would be futile. We do not reach Plaintiffs' challenge to the district court's Rule 9(b) determinations because, as we explain below, even when all the allegations in Plaintiffs' complaint are considered, they nonetheless fail to establish a pattern of racketeering activity. Thus, amendment to cure the Rule 9(b) deficiencies, if any, would be futile, and we need not reach the issue.

The district court also struck Plaintiffs' allegations of fraud against the floor plan and consumer lenders because Plaintiffs did not rely to their detriment on Defendants' misrepresentations to the lenders. In *Chisolm v. Transouth Financial Corp.*, 95 F.3d 331 (4th Cir. 1996), we held that where a RICO plaintiff alleges predicate acts of mail and wire fraud as a proximate cause of the plaintiff's injury, the plaintiff also "must have justifiably relied to his detriment on the defendant's material misrepresentation." *Id.* at 337. Plaintiffs do not allege such reliance. Yet although Plaintiffs could not recover based solely on predicate acts of fraud directed at the lenders, it does not follow that Plaintiffs are barred from using such allegations of fraud to establish a pattern of racketeering activity. Where, as here, the plaintiffs allege acts of fraud for which they satisfy *Chisolm*'s reliance requirement, the plaintiffs properly may allege acts of related fraud against other victims to establish a pattern of racketeering activity. *See*, *e.g.*, *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 685 (4th Cir. 1989) (recognizing that the RICO plaintiff could allege a pattern of racketeering activity if the plaintiff alleged that the defendants had used similar fraudulent schemes to defraud over twenty other investors). We therefore consider Plaintiffs' allegations of mail and wire fraud against the lenders in analyzing whether Plaintiffs allege a pattern of racketeering activity.

A "pattern of racketeering activity" requires "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). While a minimum of two predicate acts is required, two acts alone do not necessarily establish a pattern. *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 496 n.14, 497 (1985). To establish a pattern of racketeering activity, the plaintiff must show that the predicate acts are related and that they "amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239. The parties do not dispute whether the predicate acts of mail and wire fraud in this case are related, and we agree that the acts satisfy the relatedness requirement. The question is whether Plaintiffs establish the requisite continuity.

Continuity refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Closed-ended continuity may be established by a "series of related predicates extending over a substantial period of time." *Id.* at 242. "Predicate acts extending over a few weeks or

months and threatening no future criminal conduct do not satisfy this requirement." *Id.* Open-ended continuity may be established where, for example, the "related predicates themselves involve a distinct threat of long-term racketeering activity," or where the predicate acts "are part of an ongoing entity's regular way of doing business . . . or of conducting or participating in an ongoing and legitimate RICO enterprise." *Id.* at 242-43. We are "cautious about basing a RICO claim on predicate acts of mail and wire fraud because it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (internal quotations and citations omitted). RICO liability is reserved for "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *Menasco*, 886 F.2d at 684.

After considering all of the allegations in Plaintiffs' complaint, we conclude that the complaint does not establish the requisite continuity. This case presents, as Plaintiffs themselves describe it, a scheme "to defraud potential investors and plaintiffs by misleading them into believing that [TPHS] . . . was a thriving, financially successful business when in fact it was nothing more than a sophisticated Ponzi scheme." Defendants' conduct was all designed for the single goal of allowing Defendants to profit from their interests in TPHS. Through fraud, Defendants inflated TPHS's cash position and value, then "cashed out" by selling a controlling interest in the company. The courts, however, have repeatedly recognized that such schemes involving fraud related to the sale of a single enterprise do not constitute, or sufficiently threaten, the "long-term criminal conduct" that RICO was intended to address. *See, e.g., Vicom, Inc. v. Harbridge Merchant Serv., Inc.*, 20 F.3d 771, 782-83 (7th Cir. 1994) (finding no pattern where the defendants engaged in fraud against thousands of merchants but the fraud was designed to inflate the company's net worth); *Banks v. Wolk*, 918 F.2d 418, 423 (3d Cir. 1990) (finding no pattern where the defendant engaged in fraud to affect the purchase price of a single building). Where the fraudulent conduct is part of the sale of a single enterprise, the fraud has a built-in ending point, and the case does not present the necessary threat of long-term, continued criminal activity. *See id.*; *see also Thompson v. Paasche*, 950 F.2d 306, 311 (6th Cir. 1991) (finding no pattern where the defendant's fraudulent scheme was made inherently short-lived by the limited number of lots that the defendant had to sell). Further, there is no alle-

gation in this case that Defendants have engaged in a similar scheme involving any other enterprise. *Compare Menasco*, 886 F.2d at 685 (recognizing that the plaintiffs could allege a pattern if they alleged that the defendants engaged in similar schemes to defraud over twenty other investors).

Plaintiffs argue that open-ended continuity is established by their allegation that the fraud against the lenders was Defendants' "regular way of doing business." Plaintiffs thus attempt to fit their case into the statement in *H.J. Inc.* that open-ended continuity may be established by showing that the predicate acts "are part of an ongoing entity's regular way of doing business." *H.J. Inc.*, 492 U.S. at 242. The predicate acts of fraud directed at the lenders are relevant in this case only insofar as they are related to the acts of fraud directed at Plaintiffs, however. Further, the other allegations in the complaint belie Plaintiffs' contention that the fraud against the lenders was Defendants' regular way of doing business. As Plaintiffs explain, the very nature of the lender fraud was such that Defendants could not continue the fraud beyond a limited period of time. Further, even though Defendants continued to manage TPHS after Plaintiffs invested, the lender fraud stopped with Plaintiffs' investment, thus demonstrating that the fraud was not Defendants' regular way of doing business. Instead, the lender fraud was a way for Defendants to temporarily increase TPHS's cash position, but was not the sort of fraud that presented a particular threat of continuing into the future.

Plaintiffs also contend that because Defendants intended an initial public offering of TPHS stock, open-ended continuity is established. We disagree. An IPO would merely be the culmination of Defendants' scheme to "cash out" by selling TPHS. While an IPO might increase the number of victims of Defendants' fraud, those victims would be in the same class as Plaintiffs—other investors. The nature of Defendants' scheme would not change. The IPO would simply complete what was started with Plaintiffs' investment.

Plaintiffs also point to the July 1999 loan that Defendants induced Plaintiffs to make as demonstrating a threat of continued fraud. Yet the loan appears to be nothing more than part of a failed coverup. Further, when the loan is viewed in conjunction with the alleged IPO, the

loan is simply part of Defendants' plan to keep the company's financial problems concealed long enough to finish "cashing out."

Finally, Plaintiffs argue that even if Defendants' conduct was nothing more than "a scheme to defraud potential investors" and involved only a single business, such a scheme may nonetheless establish closed-ended continuity under *Morley v. Cohen*, 888 F.2d 1006 (4th Cir. 1989). In *Morley*, the plaintiffs were investors in the defendants' coal mining operations. As a result of the defendants' misrepresentations, the plaintiffs were induced to make repeated investments in the mining operations and were lulled into leaving their investments with the defendants for five years. The court concluded that the five-year duration of the defendants' fraudulent conduct established the requisite continuity. *Id.* at 1010. In this case, however, Plaintiffs allege predicate acts of fraud spanning only seventeen months. Even if Plaintiffs establish that the lender fraud began as early as April 1997, the duration of the fraudulent conduct is only about two years. This case does not present the type of persistent, long-term fraudulent conduct that the court faced in *Morley* or in other cases addressing closed-ended continuity. *See Walk v. Baltimore & Ohio R.R.*, 890 F.2d 688, 690 (4th Cir. 1989) (finding the requisite continuity established only by the ten-year duration of the defendants' fraudulent conduct); *Flip Mortgage Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) (finding no pattern even though the defendants' conduct took place over seven years).

We recognize that Plaintiffs suffered a significant loss as a result of Defendants' fraud. As we have repeatedly noted, however, RICO treatment is reserved for conduct "whose scope and persistence pose a special threat to social well-being." *Menasco*, 886 F.2d at 684. After considering all of the allegations in Plaintiffs' complaint, we are satisfied that Defendants' conduct does not fall "sufficiently outside the heartland of fraud cases to warrant RICO treatment." *Al-Abood*, 217 F.3d at 238. We thus conclude that the district court did not err in dismissing Plaintiffs' RICO claims under Rule 12(b)(6), and did not abuse its discretion in denying Plaintiffs leave to amend.[2] Further,

---

[2]Because the pleadings do not state a substantive RICO claim under § 1962(c), Plaintiffs' RICO conspiracy claim fails as well. *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 21 (1st Cir. 2000), *cert. denied*, 121 S.Ct. 1228 (2001).

because the district court dismissed Plaintiffs' federal law claims, the court did not abuse its discretion in dismissing Plaintiffs' pendent state law claims. *See* 28 U.S.C. § 1367(c)(3).

## IV.   CONCLUSION

Accordingly, we affirm the district court's dismissal of Plaintiffs' RICO claims and its dismissal of Plaintiffs' pendent state law claims.

*AFFIRMED*